### In re INDUSTRIAL DIAMONDS ANTITRUST LITIGATION.

**This Document Relates to All Actions.**

No. MDL–948 (WCC).

United States District Court, S.D. New York.

July 3, 1996.

As Amended July 10, 1996.

Stamell, Tabacco & Schager, New York City (Jared B. Stamell, Joseph J. Tabacco, of counsel), Wechsler Skirnick Harwood Halebian & Feffer, New York City (Robert A. Skirnick, of counsel), for Plaintiffs' Co–Lead Counsel.

Sommer & Barnard, P.C., Indianapolis, Indiana (William C. Barnard, Edward W. Harris, III, Gayle A. Reindle, of counsel), Cooper & Kirkham, P.C., San Francisco, California (Josef D. Cooper, Tracy R. Kirkham, of counsel), Heins Mills & Olson, P.L.C., Minneapolis, Minnesota (Samuel D. Heins, Daniel E. Gustafson, Kent M. Williams, of counsel), Cohen, Milstein, Hausfeld & Toll, Washington, D.C. (Jerry S. Cohen, Lilian Hagen, of counsel), for Plaintiffs' Executive Committee.

Arnold & Porter, New York City and Washington, D.C. (Michael N. Sohn, Douglas L. Wald, Rebecca E. Swenson, Kathleen A. Behan, Annemarie C. O'Shea, of counsel), Winston & Strawn, Chicago, Illinois, (Dan K. Webb, Lawrence R. Desideri, Thomas J. Frederick, of counsel), for Defendant General Electric Co.

## OPINION AND ORDER

CONNER, Senior District Judge.

This litigation presently consists of three individual lawsuits consolidated for all pretrial purposes in this court by the Judicial Panel on Multidistrict Litigation.[1] The plain-

---

**1.** Two of the cases—*American Diamond Tool & Gauge, Inc. v. De Beers Consolidated Mines, Ltd., et al.*, No. 92 Civ. 5130, and *Zollner Corp. v. De Beers Consolidated Mines, Ltd., et al.*, No. 94 Civ. 3809—were filed in this court. The third action, *Cold Spring Granite Co. v. General Electric Co.*, No. 92 CV–511, was filed in the Southern District of Ohio and transferred here by the Panel.

A fourth case, *Iljin Corp. v. General Electric Co.*, C.A. No. 4:93–40038, was filed in the District

of Massachusetts and transferred here, but has since been settled.

De Beers Consolidated Mines, Ltd., and De Beers Centenary, A.G. have not appeared. On April 4, 1994, this court entered orders noting their defaults in the *American Diamond* action. We signed similar orders in the *Zollner* action on January 20, 1995. We have not entered final judgment as to these defendants' liability, and we reserved the issues of class certification and the

tiffs in these actions are purchasers of industrial diamond products. They allege that beginning in November 1987, defendants violated section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to fix, raise, stabilize and maintain the prices of industrial diamond products. Plaintiffs bring these actions under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking treble damages, costs, attorney's fees and injunctive relief. Plaintiffs have made a motion, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3), for class certification. For the reasons set forth below, their motion is granted in part.

## BACKGROUND

Defendants General Electric Co. ("GE"), De Beers Consolidated Mines, Ltd. and De Beers Centenary, A.G. (collectively, "De Beers") mine or manufacture industrial grade diamonds, which are widely used for cutting, extruding, drilling, grinding and polishing hard materials and metals. De Beers sells both natural and synthetic industrial diamonds, while GE sells only synthetics. Synthetic industrial diamonds can be carbon-based or made from cubic boron nitride (CBN). Carbon-based industrial diamonds, whether natural or synthetic, are used for work with nonferrous materials, including tungsten carbide, glass, ceramics and cement. CBN products, which can be subjected to higher temperatures, are used for work with ferrous metals. Synthetic industrial diamonds are manufactured in two structures: polycrystalline and single crystals. Industrial diamonds range in size from powder to large crystals.

GE produces a wide range of industrial diamond products, which may be grouped into several product "families." These families are: metal bonded saw diamonds used for sawing, drilling and grooving materials like concrete, stone, ceramic and glass; RVG or MBG diamond products, which are carbon-based diamond products used for grinding nonferrous materials like tungsten carbide and glass; CBN diamonds used for grinding ferrous materials; polycrystalline tool blanks, which are carbon-based diamonds that may be cut into various shapes for use as tools or dies in machining nonferrous materials or extruding wire; CBN tool blanks used for machining ferrous materials; and drilling products used in drilling oil and gas wells and in certain mining operations.

According to GE, it offered more than 8000 distinct industrial diamond products for sale during the proposed class period. *See* Affidavit of Stephen C. Francis, dated Dec. 14, 1994, at ¶ 3. GE established list prices for many of these products,[2] but only a small percentage of customers paid the list price in any given transaction. *See id.,* at ¶¶ 5–6. Instead, individual customers negotiated a variety of discounts, rebates, credits or special service arrangements with GE. *See id.,* at ¶¶ 7–10. Furthermore, GE also designs and develops products specifically for particular customers. There are no list prices for those products; GE sets a price based on the cost of production and on negotiations with the purchaser.[3] *See id.,* at ¶ 5.

Plaintiffs allege that worldwide sales of industrial diamond products total at least $600,000,000 per year. The worldwide market is divided among De Beers (approximately 39%), GE (approximately 45%) and others (approximately 16%). Plaintiffs estimate that United States trade in industrial diamonds, including exports, totals at least $230,000,000 per year. Prices for industrial diamond products have, on average, declined during the proposed class period.

amount of damages, if any, for later determination.

**2.** According to plaintiffs, 888 of GE's products had distinct list prices in early 1992. This figure includes, in some instances, separate list prices for different sizes or volumes of the same product. *See* Affidavit of John C. Beyer, dated Apr. 6, 1995, at ¶ 22.

**3.** Because De Beers has not appeared in this proceeding and has not participated in discovery or in briefing this motion, we have little information about its products or pricing practices. From the limited information available, however, it seems safe to assume that De Beers produces an array of products comparable to GE's and that its pricing practices are similarly complex.

For the purposes of this motion, our discussion of GE's products and pricing practices should be understood to apply to De Beers as well.

Plaintiffs contend that GE and De Beers, in an effort to halt this decline, conspired to stabilize prices for industrial diamond products. According to the allegations in the complaints, which we accept as true in deciding this motion, De Beers and GE began exchanging price information in November 1987. In August 1990, GE asked De Beers to assist it in restricting supplies of diamond manufacturing equipment to Asian companies. In January 1991, GE discontinued plans to manufacture a certain type of high-grade diamond around the time that De Beers opened a facility to manufacture the same type of diamond. In early 1992, after exchanging price information, De Beers and GE almost simultaneously raised their list prices.[4] Plaintiffs allege that as a result of defendants' actions, plaintiffs have been injured by paying artificially high prices for industrial diamond products. Plaintiffs also assert that GE and De Beers fraudulently concealed the existence of the alleged conspiracy, thereby tolling the statute of limitations on plaintiffs' claims.

Plaintiffs seek certification of a class consisting of:

all persons and entities located in the United States that purchased diamonds for industrial applications directly from one of the defendants, or a corporation or other person owned or controlled by one of the defendants, at any time during the period of November 1, 1987, through May 23, 1994 (excluding (i) any federal, state and local government purchaser, and (ii) any defendant or other manufacturer of industrial diamonds, and any parent, subsidiary or affiliate of any defendant or other manufacturer of industrial diamonds).

GE opposes the certification of a class, although it does not challenge the dates selected by plaintiffs for the proposed class period.

## DISCUSSION

■■■ Plaintiffs bear the burden of establishing that they have satisfied the requirements for class certification, which are set forth in Fed.R.Civ.P. 23. *See In re Alcoholic*

*Beverages Litigation,* 95 F.R.D. 321, 324 (E.D.N.Y.1982). The court must conduct a rigorous inquiry before granting class certification in order to ensure that the requirements of Rule 23 are met. *See General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982). In evaluating a motion for class certification, however, the court does not have the authority to conduct a preliminary inquiry into the merits of the case, and hence the substantive allegations contained in the complaint are accepted as true. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). Furthermore, because of the important role that class actions play in the private enforcement of the antitrust statutes, courts resolve doubts about whether a class should be created in favor of certification. *See In re Potash Antitrust Litigation,* 159 F.R.D. 682, 688–89 (D.Minn.1995); *In re Infant Formula Antitrust Litigation,* 1992 WL 503465, at *3 (N.D.Fla. Jan. 13, 1992); *Cumberland Farms, Inc. v. Browning–Ferris Indus., Inc.,* 120 F.R.D. 642, 645 (E.D.Pa.1988); *In re South Central States Bakery Prods. Antitrust Litigation,* 86 F.R.D. 407, 423 (M.D.La.1980); *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244, 252 (S.D.Tex.1978). A party seeking class certification must satisfy all of the criteria of Rule 23(a) and at least one of the subsections of Rule 23(b).

I. Rule 23(a)

Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative

---

4. · In addition, plaintiffs also contend, based on information apparently obtained in discovery, that in March 1988, De Beers and GE almost

simultaneously raised list prices on metal bonded saw diamond products, RVG diamond products and polycrystalline diamond products.

parties will fairly and adequately protect the interests of the class.

GE contends that plaintiffs have failed to demonstrate that the typicality and adequacy requirements are satisfied in these cases.

## A. Numerosity

 GE does not dispute that plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1). The limited amount of discovery that has taken place to date has identified over 300 customers that purchased products from GE. Clearly, full discovery will reveal more purchasers. Plaintiffs and GE therefore agree that the proposed class would contain hundreds of members. Plaintiffs' inability to specify the exact number of members of the proposed class does not preclude certification, *see Alcoholic Beverages*, 95 F.R.D. at 324, so long as it is apparent that the class would be sufficiently numerous that joinder of all of the class members would be impracticable.

## B. Commonality

Likewise, GE does not dispute that the commonality requirement of Rule 23(a)(2) is met in these cases. Courts have routinely held that the commonality requirement is satisfied in cases of this sort because " '[a]ntitrust, price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.' " *Id.* (quoting *In re Sugar Indus. Antitrust Litigation,* 73 F.R.D. 322, 335 (E.D.Pa.1976)).

## C. Typicality

 Plaintiffs Cold Spring Granite Co. ("Cold Spring"), American Diamond Tool & Gauge, Inc. ("American Diamond") and Zollner Corp. ("Zollner") request that each of them be designated a representative of the proposed class. GE argues that the claims of these plaintiffs are not typical of the claims of the putative class members. The typicality requirement of Rule 23(a)(3) is satisfied when the claims of the representative plaintiffs and the absent class members are based on the same legal or remedial theory

and there are no antagonistic interests between the two. *See Alcoholic Beverages,* 95 F.R.D. at 324. The claims asserted by the representative plaintiffs and the absent class members need not be identical, as "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences" between their respective claims. *See Potash,* 159 F.R.D. at 690. There is certainly a strong similarity in the legal theory asserted by these plaintiffs and by the putative class members: each purchaser contends that it was injured because it paid a supracompetitive price for industrial diamond products as a result of defendants' conspiracy to stabilize prices.

Moreover, the class for which plaintiffs seek certification includes both direct and indirect purchasers.[5] Plaintiffs Cold Spring and Zollner purchased GE's products directly from GE beginning in 1990. Therefore, these plaintiffs' claims are typical of the claims of the putative class members who purchased industrial diamond products directly from defendants. In addition, plaintiffs Cold Spring and Zollner made indirect purchases of GE's products through The Van Itallie Company, Inc. ("Van Itallie"), GE's United States distributor, from 1987 through 1990. Throughout the class period, plaintiffs Cold Spring and American Diamond made indirect purchases of De Beers's products through Anco Diamond Abrasives Corp. ("Anco"), De Beers's United States distributor. Therefore, each plaintiff asserts claims typical of the claims of putative class members who made indirect purchases of defendants' products.

GE contends, however, that because some of plaintiffs' purchases were indirect, their interests are antagonistic to the interests of the putative class members that purchased directly from GE and De Beers. GE asserts that Cold Spring, American Diamond and Zollner will have to devote substantial resources to arguing that the portions of their claims based on their indirect purchases are not barred by the rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), under which many indi-

---

**5.** The proposed class definition includes persons who purchased industrial diamond products directly from GE or De Beers or from a corporation "owned or controlled" by GE or De Beers.

rect purchasers are barred from recovering on antitrust claims. GE is correct, of course, that the inclusion of indirect purchasers in the proposed class raises *Illinois Brick* issues.[6] Nonetheless, there are several reasons why the presence of indirect purchasers in the proposed class does not destroy typicality.

First, plaintiffs Cold Spring and Zollner have made both direct and indirect purchases and therefore have every incentive to demonstrate that they are entitled to recover under both theories. Second, at this juncture, we see no inherent conflict of interest between the direct and indirect purchasers. All of the members of the proposed class have the same interest in proving that defendants conspired to artificially inflate the prices of industrial diamond products. Plaintiffs must, of course, also prove their allegations that GE and De Beers owned or controlled the entities from which plaintiffs and the indirect purchaser members of the proposed class bought industrial diamond products. They should be able to do so, if at all, through proof of the relationships between GE and De Beers and their distributors, which should be common to all of the indirect purchaser class members. Hence, this aspect of plaintiffs' claims should not consume so great a proportion of their resources that the presentation of the direct purchasers' case would be shortchanged. Third, the dispute over whether indirect purchasers may recover from GE and De Beers goes to the merits of plaintiffs' claims, rather than to whether a class should be certified. Therefore, it is not appropriate for us to consider this issue at this time. *See In re Domestic Air Transp. Antitrust Litigation,* 137 F.R.D. 677, 696 (N.D.Ga.1991); *In re Independent Gasoline*

*Antitrust Litigation,* 79 F.R.D. 552, 560 n. 9 (D.C.Md.1978).

### D. Adequacy

■ Finally, Rule 23(a) requires that "the representative parties ... fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement "has been interpreted to embrace both the competence of the legal counsel and the statu[r]e and interest of the named representative parties themselves." *Alcoholic Beverages,* 95 F.R.D. at 325. GE challenges plaintiffs' adequacy on two grounds: (1) that plaintiffs will divert resources from the pursuit of the direct purchasers' claims to litigate the *Illinois Brick* issues and (2) that each plaintiff purchased only a tiny percentage of the products that defendants sold during the proposed class period and therefore has no incentive to offer proof of the effect of the alleged conspiracy on those products that it did not purchase. We have already explained that we see no inherent conflict of interest between direct and indirect purchaser members of the proposed class. Furthermore, in the event that conflicts develop, we would consider certifying appropriate subclasses to ensure that the putative class members are adequately represented.

Furthermore, plaintiffs are not inadequate representatives of the putative class members simply because they purchased only a fraction of the products affected by the alleged conspiracy. Where the plaintiffs have alleged a single conspiracy to artificially inflate prices, a representative plaintiff may satisfy the adequacy requirement without having purchased products from all of the defendants, having bought all of the affected products or having made purchases

---

**6.** Plaintiffs contend that the "control" exception to the *Illinois Brick* rule permits recovery by indirect purchasers who purchase from entities owned or controlled by defendants. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736 n. 16, 97 S.Ct. 2061, 2070 n. 16, 52 L.Ed.2d 707 (1977) (citing *In re Western Liquid Asphalt Cases,* 487 F.2d 191, 197, 199 (9th Cir.1973), *cert. denied,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974)); *Arizona v. Shamrock Foods Co.,* 729 F.2d 1208, 1212 n. 2 (9th Cir.1984), *cert. denied,* 469 U.S. 1197, 105 S.Ct. 980, 83 L.Ed.2d 982

(1985); *Jewish Hosp. Ass'n v. Stewart Mechanical Enters., Inc.,* 628 F.2d 971, 975 (6th Cir.1980), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1483, 67 L.Ed.2d 615 (1981); *In re Beef Indus. Antitrust Litigation,* 600 F.2d 1148, 1162 (5th Cir.1979); *In re Mid–Atlantic Toyota Antitrust Litigation,* 516 F.Supp. 1287, 1292 (D.C.Md.1981).

GE argues that neither the Supreme Court nor the Second Circuit has recognized this "extension" of *Illinois Brick*'s "control" exception and contends that we should decline to follow the cases cited by plaintiffs.

throughout the entire class period. *See South Central*, 86 F.R.D. at 418–19; *Independent Gasoline*, 79 F.R.D. at 557–58. The crucial inquiry is not how many of defendants' products each plaintiff purchased, but rather whether each plaintiff has sufficient incentive to present evidence that will establish the existence of the alleged conspiracy and its effect on the prices of the products purchased by the putative class members.

With respect to the claims of purchasers of those products for which GE and De Beers set list prices, we see no merit in GE's argument. Plaintiffs allege that De Beers and GE conspired to set their list prices at artificially high levels in order to inflate the purchase prices paid for products subject to those list prices. The same proof that would demonstrate that GE and De Beers conspired to raise one list price—*e.g.*, evidence that defendants' representatives exchanged list-price information and agreed on subsequent list prices—seems likely to establish that they conspired to set other list prices at artificially high levels as well. Each plaintiff bought list-price products from GE or from distributors that plaintiffs allege were owned or controlled by GE and De Beers. Therefore, it appears that each plaintiff has a strong interest in presenting evidence that will tend to prove the claims of putative class members who purchased list-price products, because the same evidence will most likely tend to prove its own claims.

GE's argument has more force, however, when we consider it in the context of the claims of those putative class members who purchased only those products for which defendants did not set list prices. GE set the prices of those products on the basis of the cost of production and negotiations with the purchasers. It is quite possible that plaintiffs, although they have every incentive to prove that GE and De Beers conspired to raise the prices of industrial diamond products, would not have a substantial interest in establishing that the conspiracy affected the price of each and every one of the non-list price products purchased by absent class members. Because of the conclusions that we reach below in our discussion of the pre-

dominance requirement, we need not reach a conclusion about whether plaintiffs are inadequate representatives of the proposed class on this basis. Instead, we simply note our concern on this point.

## II. Rule 23(b)(3)

Plaintiffs' class certification motion is made under Rule 23(b)(3), which states that

> [a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ... (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

GE contends that plaintiffs have failed to demonstrate that the predominance and superiority requirements have been met in these cases.

### A. Predominance

GE contends that individual issues predominate over common questions of law and fact with respect to plaintiffs' price-fixing claims and their assertions that GE fraudulently concealed the existence of the alleged conspiracy.

#### 1. Price–Fixing

▮ In order to prevail on their price-fixing claims, plaintiffs must demonstrate: (1) a violation of the antitrust laws by defendants; (2) some injury to plaintiffs' business or property as a result of the violation (causation or "impact") and (3) the amount of damages sustained by the plaintiffs. *See Uniondale Beer Co. v. Anheuser–Busch, Inc.*, 117 F.R.D. 340, 342 (E.D.N.Y.1987); *see also Domestic Air*, 137 F.R.D. at 685. On a motion for class certification, "[p]laintiffs' burden is to establish that common or 'generalized proof' will predominate at trial with respect to these three essential elements of their antitrust claim." *Domestic Air*, 137 F.R.D. at 685.

With respect to the first element of plaintiffs' price-fixing claims, GE does not dispute that plaintiffs will present common proof re-

garding the existence and scope of the alleged conspiracy between GE and De Beers. *See, e.g., In re Catfish Antitrust Litigation,* 826 F.Supp. 1019, 1034 (N.D.Miss.1993); *Sugar Indus.,* 73 F.R.D. at 345–46.

GE contends, however, that the products sold by defendants are so diverse and the purchase prices that they charge are so frequently subject to individually negotiated discounts, credits or rebates that the issues of impact and damages would not be susceptible to common proof. GE asserts that resolving these issues would require us to conduct hundreds of individual minitrials in order to determine what each putative class member paid for each product that it bought and what the purchase price for that transaction would have been in the absence of the alleged conspiracy. With respect to the damages element of plaintiffs' claims, it is apparent that there will be numerous individual issues to resolve. Courts have routinely held, however, that the need for individualized determinations of the putative class members' damages does not, without more, preclude certification of a class under Rule 23(b)(3). *See, e.g., Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 456 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Potash,* 159 F.R.D. at 697; *Catfish,* 826 F.Supp. at 1043–44; *Alcoholic Beverages,* 95 F.R.D. at 327–28; *South Central Bakery,* 86 F.R.D. at 419.

■ The issue of impact is more troublesome, however. In order to show impact in a price-fixing case, a plaintiff must demonstrate that it suffered some injury as a result of defendants' violation of the antitrust law. On a motion for class certification, the issue confronting the court is whether the proof necessary to demonstrate impact as to each class member is particular to that class member, in which case individual questions concerning impact would overwhelm the common questions concerning the existence and scope of the alleged conspiracy, or whether the necessary proof of impact would be common to all class members and sufficiently generalized that class treatment of their claims would be feasible. Some courts have held that common questions predominate because "as a general rule, an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." [7] *E.g., Alcoholic Beverages,* 95 F.R.D. at 327 (internal quotation omitted). Other courts have stressed the need for a careful examination of the facts of each case in order to determine whether common proof of impact is possible. *See, e.g., Windham v. American Brands, Inc.,* 565 F.2d 59 (4th Cir.1977), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); *Bogosian,* 561 F.2d at 454–55. As the *Bogosian* court put it:

> [W]hen an antitrust violation impacts upon a class of persons . . ., there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not [impact] can be proven on a common basis therefore depends upon the circumstances of each case.

*Bogosian,* 561 F.2d at 454.

As a practical matter, it often makes little difference which view the court espouses. The presumption articulated by the *Alcoholic Beverages* court is, at most, a general rule. Antitrust defendants are free to argue, as many of them do, that their cases are exceptional because too many variables enter into setting prices in their industries to permit common proof of impact. Once a defendant raises that contention, the court must examine the circumstances of the industry in question to determine whether common proof of impact is possible in that case.

---

7. As support for this proposition, the *Alcoholic Beverages* court relied in part on *In re Master Key Antitrust Litigation,* 528 F.2d 5, 12 n. 11 (2d Cir.1975) (dismissing appeal for lack of appellate jurisdiction), in which the Second Circuit stated in *dictum* that if the class plaintiffs in that case could establish that the defendants had engaged in a conspiracy that stabilized prices at supra-competitive levels and could show that each class member purchased the affected product, a jury could reasonably conclude that each class member suffered some injury as a result of the conspiracy.

The Second Circuit has never squarely addressed the issue of impact in the class action context, however.

Here, GE contends that the wide variety of products sold by defendants, the large number of transactions during the class period and the prevalence of individually negotiated prices render common proof of impact impossible. Although plaintiffs argue that the industrial diamond industry is somewhat less complex than GE would have us believe, they do not seriously dispute that defendants market thousands of industrial diamond products and that individually negotiated prices are common. Instead, they contend that common proof of impact is possible despite this diversity of products and prices. After reviewing the information submitted by the parties concerning the industrial diamond industry, we are persuaded that despite the wide range of products and prices involved, common proof of impact is possible on behalf of purchasers who bought list-price products. Common proof of impact is not possible, however, on behalf of those purchasers who bought non-list price products.

In a number of price-fixing cases concerning industries where discounts and individually negotiated prices are common, courts have certified classes where the plaintiffs have alleged that the defendants conspired to set an artificially inflated base price from which negotiations for discounts began.[8] *See Potash,* 159 F.R.D. at 696 n. 19; *Domestic Air,* 137 F.R.D. at 689; *Fisher Bros. v. Mueller Brass Co.,* 102 F.R.D. 570, 578 (E.D.Pa.1984); *In re Glassine & Greaseproof Paper Antitrust Litigation,* 88 F.R.D. 302, 306–07 (E.D.Pa.1980); *Hedges Enters., Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 475 (E.D.Pa.1979); *see also Catfish,* 826 F.Supp. at 1040–41; *In re Screws Antitrust*

*Litigation,* 91 F.R.D. 52, 55 (D.Mass.1981). The theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.

Therefore, if plaintiffs prove at trial that GE and De Beers conspired to set artificially high list prices and if they prove that those list prices were the basis for individual price negotiations between defendants and their customers, a jury could reasonably conclude that the purchasers of list-price products were impacted by the alleged conspiracy.[9] GE contends, however, that the transaction price for any given purchase was entirely divorced from the list price for that product and that therefore individual proof of impact would be necessary for each purchaser.

We are not persuaded that list prices and transaction prices bore no relationship to one another. First, GE's argument is inherently implausible because if GE were correct, there would be no reason for defendants to raise list prices. Moreover, the testimony of plaintiffs' expert economist provides some support for the proposition that individual negotiations for discounts, credits and rebates were based, at least in part, on the applicable list price. Plaintiffs' expert examined transaction data provided by GE for purchases made between January 1989 and October 1993 of products that were affected by the 1992 list price increases. His analysis

---

**8.** GE cites several horizontal price-fixing conspiracy cases in which courts declined to certify classes, despite the existence of base prices of some sort, because individual questions regarding proof of impact predominated over common questions. *See Kenett Corp. v. Mass. Furniture & Piano Movers Ass'n, Inc.,* 101 F.R.D. 313, 314 (D.Mass.1984) (standard fee schedules established by association of moving companies); *American Custom Homes v. Detroit Lumberman's Ass'n,* 91 F.R.D. 548, 549 (E.D.Mich.1981) (price listings published by retail lumber dealers' association); *In re Beef Indus. Antitrust Litigation,* 1986–2 Trade Cas. (CCH) ¶ 67,277, at 61,414 (S.D.Tex.1986) (prices published in industry "yellow sheet").

None of these cases specifically discusses the base price argument advanced by plaintiffs. To the extent that the results of these cases may conflict with the reasoning of the cases cited in the text, we find the latter group of cases more persuasive.

**9.** Of course, the precise quantum of damages that each purchaser suffered would differ depending upon the purchase price that it was able to negotiate with defendants or their distributors. Individual questions would certainly arise in determining that figure, but those issues go to ascertaining damages rather than to demonstrating impact.

indicates that the 1992 list price increases had, in general, an upward effect on the transaction prices paid by purchasers of those products.[10] *See* Beyer Aff., at ¶¶ 18, 26–27, 34–36.

GE has submitted an expert affidavit that quarrels with the methodology underlying the analysis performed by plaintiffs' expert and that questions the accuracy of his work. *See* Affidavit of John P. Gould, dated June 19, 1995. We need not consider this testimony in detail, as it is for the jury to evaluate this conflicting evidence and to determine what weight to give to the experts' conclusions. *See Screws,* 91 F.R.D. at 57 n. 5.; *see also Catfish,* 826 F.Supp. at 1042; *Domestic Air,* 137 F.R.D. at 692. At this juncture, it is sufficient for our purposes that plaintiffs have demonstrated that they can produce some evidence that the list prices set by defendants formed the basis for subsequent individualized price negotiations.

With respect to the claims of purchasers of non-list price products, however, plaintiffs have not demonstrated that impact may be established through common proof. GE asserts, and plaintiffs do not seriously question, that it sold thousands of distinct products for which it did not set list prices. Many of these products were developed specifically for particular customers. GE set prices for these products based on the cost of production and on negotiations with each purchaser.

In order to determine whether purchasers of these products suffered some injury, we would be required to scrutinize each transaction to ascertain whether the purchaser paid a supracompetitive price. We do not have any information about the number of purchases of non-list price products that occurred between November 1, 1987, and May 23, 1994. The scope of the task of determining impact with respect to each purchaser of non-list price products is therefore only dimly discernible. Given the large number of products involved, however, it is readily apparent that it would be an enormous undertaking. It is also apparent that individual issues of impact would predominate over common questions concerning the existence and scope of the alleged conspiracy.

Accordingly, we conclude that with respect to plaintiffs' price-fixing claims, common questions predominate over individual questions for purchasers of list-price products. Individual questions predominate, however, with respect to the claims of purchasers of non-list price products.

### 2. Fraudulent Concealment

■ Plaintiffs contend that defendants fraudulently concealed the alleged conspiracy, thereby tolling the statute of limitations on plaintiffs' claims.[11] In order to prove fraudulent concealment, plaintiffs must es-

---

**10.** As part of his analysis, plaintiffs' expert identified 955 pairs of transactions, involving 127 customers, in which the same customer bought the same amount of the same product before and after the 1992 list price increases. He found that the transaction prices paid by 108 of the 127 customers increased following the 1992 list price increases. *See* Beyer Aff., at ¶¶ 32–34.

GE contends that the fact that the transaction prices paid by 19 of the customers declined demonstrates that some purchasers were not impacted at all by the 1992 list price increases. GE therefore argues that the testimony of plaintiffs' own expert supports its contention that individualized inquiry is necessary to determine whether each class member suffered some injury as a result of the alleged conspiracy. We are not persuaded.

Plaintiffs do not argue that purchasers of list-price products were impacted because the 1992 list prices resulted in transaction prices that were higher in absolute terms. Instead, they argue that the transaction prices paid by purchasers following the 1992 list price increases

were higher than they would have been if the list prices had been set in a competitive market. The results of the analysis conducted by plaintiffs' expert do not disprove this theory: it is quite possible that in the absence of the 1992 list price increases, those 19 customers would have paid even lower transaction prices. *See id.,* at ¶ 35.

In fact, by demonstrating that the transaction prices paid by many customers rose, in absolute terms, following the 1992 list price increases, the testimony of plaintiffs' expert provides some support for plaintiffs' theory that the transaction prices paid by those 19 customers were also higher than they would have been if defendants had not, as plaintiffs allege, set their list prices at artificially high levels.

**11.** A four-year statute of limitations applies to plaintiffs' claims for treble damages. *See* 15 U.S.C. § 15b. Therefore, plaintiffs must demonstrate that defendants fraudulently concealed the alleged price-fixing conspiracy, or certain portions of their claims are time-barred.

tablish (1) that defendants affirmatively concealed their actions and (2) that plaintiffs lacked knowledge of their causes of action despite (3) exercising due diligence. *See Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 42 (S.D.N.Y.1990). GE argues that the individual questions presented by plaintiffs' claims of fraudulent concealment predominate over the common questions in these cases and therefore preclude certification of a class.

■■■ The issue of whether defendants actively concealed the alleged conspiracy clearly presents common questions of law and fact. The issues of each putative class member's lack of knowledge and due diligence may require individualized consideration, however. *See Town of New Castle*, 131 F.R.D. at 42–43; *Fisher Bros.*, 102 F.R.D. at 579; *Glassine*, 88 F.R.D. at 307. Nevertheless, the majority of courts that have considered this issue have held that these individual issues do not preclude the certification of a class. *See Town of New Castle*, 131 F.R.D. at 42–43; *Catfish*, 826 F.Supp. at 1044; *Fisher Bros.*, 102 F.R.D. at 579; *Independent Gasoline*, 79 F.R.D. at 559. Instead, any individual questions concerning each putative class member's lack of knowledge and due diligence may be considered, if necessary, when the court addresses each putative class member's damage claim. *See Catfish*, 826 F.Supp. at 1044; *In re Fine Paper Antitrust Litigation*, 82 F.R.D. 143, 155 (E.D.Pa.1979), *aff'd*, 685 F.2d 810 (3d Cir.1982), *cert. denied*, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983); *In re Plywood Anti–Trust Litigation*, 76 F.R.D. 570, 586 (E.D.La.1976).

### 3. Summary

In sum, we conclude that common questions concerning the existence and scope of the alleged conspiracy, its impact on those purchasers who bought list-price products, and defendants' alleged concealment of the conspiracy predominate over individual issues of each putative class members' damages, lack of knowledge of the conspiracy and due diligence. Therefore, plaintiffs have demonstrated that the predominance requirement of Rule 23(b)(3) is satisfied with respect to those putative class members who purchased list-price products. With respect to those putative class members who purchased non-list price products, however, individual issues predominate.

### B. Superiority

The final criterion that we must consider in deciding whether to certify a class in this proceeding is whether a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The considerations that are pertinent to this inquiry include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.*

Neither plaintiffs nor GE has argued that any putative class member has a strong interest in maintaining a separate action. Moreover, we are not aware of any litigation pending elsewhere concerning this controversy. Indeed, the Judicial Panel on Multidistrict Litigation has ordered that any actions arising out of this controversy be transferred to this court for consolidated pre-trial proceedings. Consolidation of the claims in this forum has therefore been deemed desirable.

■■■ GE argues, in fact, that consolidation for pre-trial purposes, and perhaps for trial, is superior to class certification as a method for adjudicating these cases. GE contends that if we decline to certify a class, it is unlikely that additional purchasers will file actions against defendants. We would therefore be called upon to resolve only the claims of the plaintiffs in the three actions currently pending. GE argues that this approach would permit us to avoid invoking the costly and time-consuming machinery of class adjudication and tackling the individual questions raised by the claims of each putative class member.

While GE is most likely correct that handling only the three currently pending actions would consume less of this court's time than adjudicating a class action, we are not persuaded that consolidation, rather than class certification, is the superior method of adjudication in this situation. The premise of GE's argument is its belief that plaintiffs' antitrust claims are without merit. GE contends that most of the purchasers of industrial diamond products share its assessment of plaintiffs' claims and that therefore few of them are likely to file suit against defendants if we deny plaintiffs' motion for class certification. For obvious reasons, we are not inclined to base our determination of whether to certify a class on GE's assessment of the strength of plaintiffs' case. Indeed, for the purposes of this motion, we must accept as true plaintiffs' allegations and assume that they will be able to prove that De Beers and GE conspired to artificially inflate the prices of industrial diamond products.

Furthermore, rather than supporting GE's argument that most of the purchasers of industrial diamond products recognize that plaintiffs' claims are meritless, the fact that only three plaintiffs are currently pursuing claims against defendants in this proceeding may simply indicate that many purchasers' claims are for relatively small amounts of damages. Those purchasers may have insufficient economic justification for commencing expensive litigation against GE and De Beers. In addition, many purchasers, including those with larger claims, undoubtedly still depend on GE and De Beers for their supply of industrial diamond products and may be hesitant to disrupt those relationships. In this sort of situation, a class action may be the only practical method for resolving their claims.

Finally, we turn to the question of manageability. Although common questions predominate over individual issues with respect to the claims of those putative class members who purchased list-price products from GE and De Beers, we have identified a number of individual issues that will require resolution. First, we will be called upon to decide the amount of damages suffered by each putative class member who purchased list-price products. In addition, each putative class member who purchased list-price products outside the four-year limitations period must establish that it had no knowledge of the alleged conspiracy despite exercising due diligence. Based on our current knowledge of these cases, it appears that these individual issues are likely to manageable. Our current information is rather limited, however, and this preliminary assessment may prove to be incorrect.

For this reason, we conclude that the most efficient way to proceed in this case is to bifurcate the trial of these actions. In the first phase, we will try the issues of conspiracy and impact, and the jury will determine liability. The jury will also consider the issue of whether defendants concealed the alleged conspiracy. In the event that the jury finds defendants liable, we will revisit the question of whether class treatment of the damage issues is feasible. At that point, we will have a number of options, including utilizing a formula to calculate damages, referring the damage issues to a special master or trying these issues, perhaps after certifying appropriate subclasses. *See, e.g., Potash,* 159 F.R.D. at 698; *In re Workers' Compensation,* 130 F.R.D. 99, 110 (D.Minn.1990); *Corrugated Container,* 80 F.R.D. at 253. If no manageable method of resolving the damage issues is available, we would also have the option of decertifying the class insofar as those issues are concerned and permitting each class member to proceed individually if it elects to do so.

At present, however, our concerns about manageability are merely speculative, and we conclude that certification of a class is the superior method for providing a fair and efficient adjudication of these cases.

## CONCLUSION

For the foregoing reasons, we grant in part plaintiffs' motion for class certification. Because we have concluded that plaintiffs failed to satisfy the predominance requirement with respect to those putative class members who did not purchase list-price products, we have modified the class definition proposed by plaintiffs accordingly. We

therefore certify a class, pursuant to Rules 23(a) and 23(b)(3), consisting of:

> all persons and entities located in the United States that purchased industrial diamond products for which the defendants set list prices directly from one of the defendants, or a corporation or other person owned or controlled by one of the defendants, at any time during the period of November 1, 1987, through May 23, 1994 (excluding (i) any federal, state or local government purchaser, and (ii) any defendant or other manufacturer of industrial diamonds, and any parent, subsidiary or affiliate of any defendant or other manufacturer of industrial diamonds).

We designate plaintiffs Cold Spring, American Diamond and Zollner as representatives of this class.

SO ORDERED.