119 F.Supp.2d 418 (2000)
In re INDUSTRIAL DIAMONDS ANTITRUST LITIGATION.
This Document Relates To: American Diamond Tool & Gauge, Inc.
v.
De Beers Consolidated Mines, Ltd., et al.,
and
Zollner Corp.
v.
De Beers Consolidated Mines, Ltd., et al.
Nos. MDL-948 (WCC), 92 Civ. 5130(WCC), 94 Civ. 3809(WCC).
United States District Court, S.D. New York.
November 1, 2000.
Stamell & Schager, LLP, New York City, Jared B. Stamell, of counsel, Meredith Cohen Greenfogel & Skirnick, PC, New York City, Robert A. Skirnick, of counsel, Berman DeValerio Pease & Tabacco LLP, San Francisco, CA, Joseph J. Tabacco, Jr., of counsel, Cooper & Kirkham, San Francisco, CA, Joseph D. Cooper, of counsel, Sommer & Barnard, Indianapolis, IN, William C. Barnard, Edward W. Harris, III, of counsel, for plaintiffs.

OPINION AND ORDER
WILLIAM C. CONNER, Senior District Judge.
This antitrust class action charges a conspiracy between defendant General Electric Co. ("GE") and defendants De Beers *419 Consolidated Mines, Ltd. and De Beers Centenary, A.G. (collectively "De Beers") to fix prices for industrial diamonds in violation of Section 1 of the Sherman Act, 15 U.S.C. § 15. It is now before the Court on an inquest to assess damages, pursuant to FED.R.CIV.P. 55(b)(2), following a default by De Beers. For the reasons stated hereinafter, the Court finds that plaintiffs have thus far failed to prove their damages with sufficient definiteness to support a judgment against De Beers.

BACKGROUND

Procedural History
This litigation was started as three separate antitrust class actions against GE and De Beers, two of the actions being brought in this Court respectively by American Diamond Tool & Gauge, Inc. (92 Civ. 5130) and Zollner Corp. (94 Civ. 3809) and one in the Southern District of Ohio by Cold Spring Granite Co. (92 CV 511). The latter action was transferred to this Court by the Judicial Panel on Multidistrict Litigation for consolidated discovery with the two actions pending here. De Beers did not answer or otherwise appear in either of the New York actions and default judgment was entered against it on April 4, 1994 in Case No. 92 Civ. 5130 and on January 20, 1995 in Case No. 94 Civ. 3809. De Beers was not named as a defendant in the Ohio action.
Plaintiffs in all three actions moved under FED.R.CIV.P. 23(a) and 23(b)(3) for class certification and, in a decision filed July 10, 1996 and reported at 167 F.R.D. 374, this Court certified a plaintiff class consisting of:
all persons and entities located in the United States that purchased industrial diamond products for which the defendants set list prices directly from one of the defendants, or a corporation or other person owned or controlled by one of the defendants, at any time during the period of November 1, 1987, through May 23, 1994 (excluding (i) any federal, state or local government purchaser, and (ii) any defendant or other manufacturer of industrial diamonds, and any parent, subsidiary or affiliate of any defendant or other manufacturer of industrial diamonds).
Following extensive discovery and negotiation, GE settled all claims asserted against it by the plaintiff class by agreeing to pay plaintiffs' attorneys fees and expenses ($1,850,000 and $500,000 respectively) and to give each class member an in kind rebate of free diamonds of like grade and quality to their purchases of industrial diamonds from GE during a "claim period" of 20 months after the settlement became final, in an amount equal to 3% of the diamonds purchased by the member from GE during the claim period. If a class member purchased no diamonds from GE during the claim period, it was given the option of either transferring a share of its right to such in-kind rebate to another entity or of receiving from GE a cash payment of $1,000. After notification of the class members and a fairness hearing, the settlement was approved by the Court on July 23, 1999.

The Inquest
The Court conducted an inquest to fix damages against the defaulting defendant De Beers on July 26, 2000. The only witness was Dr. Michael C. Keeley, plaintiffs' economics expert. De Beers was not represented at the hearing. An attorney for its Irish subsidiary, De Beers Industrial Diamonds (Ireland), attended the hearing, but declined the Court's invitation to cross-examine the witness or otherwise actively participate.
Because all of the court reporters in the courthouse were occupied on other cases at the time, counsel agreed to have the proceedings recorded by machine. Unfortunately, it was later discovered that the recording machine had malfunctioned and that a readable record had been made of only a short portion at the end of the hearing. However, there was no prejudice because, along with their post-hearing memorandum, plaintiffs submitted an affidavit of Dr. Keeley repeating the substance of his testimony.

*420 DISCUSSION

The Applicable Law
While a default constitutes an admission of all the facts "well pleaded" in the complaint, it does not admit any conclusions of law alleged therein, nor establish the legal sufficiency of any cause of action.
Once the default is established, defendant has no further standing to contest the factual allegations of plaintiffs claim for relief. Even after the default, however, it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.
10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, Federal Practice & Procedure, Civil 3d, § 2688, at 63 (1988). A fact is not "well pleaded" if it is inconsistent with other allegations of the complaint or with facts of which the court can take judicial notice. See Trans World Airlines v. Hughes, 449 F.2d 51, 63 (2d Cir.1971).
Likewise, a default does not constitute an admission as to the amount of damages claimed, which must be established at an evidentiary hearing.
Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.
Credit Lyonnais Securities (USA), Inc. v. Alcantara et al., 183 F.3d 151, 155 (2d Cir.1999) (citations omitted). At the inquest in this case, plaintiffs sought to establish the amount of their damages by calculations described in the report and opinion testimony of their economics expert, Dr. Keeley.

The Opinion of Dr. Keeley
In theory, the methodology employed by Dr. Keeley to calculate the damages sustained by plaintiffs as a result of defendants' price-fixing conspiracy was simple and logical. First, he estimated the average "but for" U.S. market price that would have prevailed for each of 3 categories of industrial diamonds for each year of the class period in the absence of the price-fixing conspiracy by plotting on a graph a straight line extending from the last market price before the class period to the first market price after the class period. Next, for each year, he ascertained the actual average market price of that category of diamonds and subtracted from it the average "but for" price to determine the average price inflation attributable to the conspiracy that year. Then, for each year, he multiplied this average price inflation by the estimated total volume of U.S. sales of each category of diamonds during that year to determine the total damages for that year. Then he added these annual damages to determine the total damages for the class period. Finally, he increased the damages by an inflation factor to compensate for the lesser present value of dollars relative to their value during the class period. By this process, he computed total damages of $52,033,581 before the inflation adjustment and $68,811,674 after such adjustment. Thus, after trebling of the damages and deduction of $8 million as the estimated monetary value of the settlement with GE (Gary L. French Decl., Ex. E to Pls.' Mem.Supp. GE Settlement), plaintiffs sought judgment against De Beers in the amount of $198,435,022.
However, in practice, Dr. Keeley's application of this straightforward methodology was riddled with error. First, he ignored two specific limitations in the class definition and based his computations on two types of sales which were expressly excluded.

1. Inclusion of Excluded Sales

a. Non-List-Price Products
One of these improper inclusions was called to plaintiffs' attention at the inquest *421 when the Court reminded plaintiffs' counsel that the class was limited to "all persons and entities located in the United States that purchased industrial diamond products for which the defendants set list prices ..." (emphasis added), and inquired whether Dr. Keeley had based his computations only on diamond products for which the defendants had set list prices. Obviously, plaintiffs' counsel had overlooked this limitation in the class definition, because after the hearing, they submitted a supplemental report of Dr. Keeley in which he stated that he had learned that list prices had not been set for some diamonds in one of the categories on which he had based his original computations and he accordingly reduced his computed damages for that category of diamonds by 15%, reducing the total damages to $49,350,592 plus an inflation adjustment of $15,928,582 for a total of $65,279,174 before trebling. After trebling and deduction of credit for the estimated value of the GE settlement, plaintiffs now seek judgment against De Beers in the reduced amount of $187,837,522. However that modest amendment left uncorrected a number of much more serious errors in Dr. Keeley's computations, such as inclusion of a large volume of purchases of industrial diamonds for which damages cannot be assessed against De Beers and reliance on mere estimates of sales of industrial diamonds where actual sales figures were available.

b. Indirect Purchases
Dr. Keeley based his computation of damages on estimates of the total U.S. sales of industrial diamonds by both GE and De Beers. This was a clear error of considerable magnitude. De Beers did not sell directly to any members of the plaintiff class or any other U.S. purchasers similarly situated. De Beers industrial diamonds are marketed in the U.S. by distributors from 1974 through 1988 by Anco Diamond Corp. ("Anco") and Diamond Abrasives Corp. ("DAC") and from 1989 on by DAC alone.
To award damages against De Beers based on plaintiffs' purchases of industrial diamonds not directly from De Beers but from an independent distributor would violate the rule of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) that those who purchased the products of a price-fixing defendant indirectly through an independent middleman may not recover damages therefor from that defendant. The Illinois Brick opinion suggests that a defendant may be held liable to an indirect purchaser who bought from a distributor owned or controlled by that defendant. Id. at 736 n. 16, 97 S.Ct. 2061. It was for these reasons that the plaintiff class was defined as
all persons and entities located in the United States that purchased industrial diamond products ... directly from one of the defendants, or a corporation or other person owned or controlled by one of the defendants .... (emphasis added).
Plaintiffs did not allege that either Anco or DAC was owned or controlled by De Beers during the class period and submitted no evidence of such ownership or control. The closest approach to such an allegation was in paragraph 3 of the complaints in the American Diamond and Zollner cases, which read:
Plaintiff made purchases of diamonds for industrial applications directly from one or more of the defendants or a corporation owned or controlled by, or acting in combination with one or more of the defendants, during the time period relevant to this action.
Obviously, the allegation that a plaintiff purchased industrial diamonds directly from "one or more" of the defendants would be true even if the plaintiff had purchased directly only from GE and never from De Beers. Likewise the disjunctive allegation that the plaintiff purchased directly from a corporation owned or controlled by "one or more" of the defendants *422 does not constitute an averment that De Beers owned or controlled Anco or DAC or any other corporation from whom the plaintiff purchased diamonds.
Moreover, an allegation of ownership or control of Anco by De Beers would be inconsistent with averments in the affidavit of Thomas M. Corcoran filed by plaintiffs as one of their post-hearing submissions. Corcoran stated that he was employed by Anco from 1974 through 1988, during which time Anco was one of two U.S. distributors of De Beers industrial diamonds. He characterized Anco as an "independent dealer" (Corcoran Aff. ¶ 4) and stated that he "had discussions with De Beers at the time De Beers terminated [Anco] as a De Beers distributor" (Id. ¶ 13). This is not language one would use to describe a relationship between a parent and a wholly owned or controlled subsidiary.
Thus ownership or control of either Anco or DAC by De Beers was not alleged at all, much less being "well pleaded." Therefore De Beers' default does not warrant a finding that it owned or controlled any company from whom plaintiffs purchased De Beers' industrial diamonds.
This does not mean that De Beers has no liability to any member of the plaintiff class. If any of them purchased directly from GE industrial diamond products for which list prices were set by agreement between defendants, and was injured by paying prices higher than those that it would have had to pay in the absence of such agreement, De Beers would be jointly and severally liable for such injury. But the damages must be computed only on the purchases from GE. Assessing damages against De Beers on the basis of the total of U.S. purchases from both GE and De Beers, would result in holding De Beers liable to indirect purchasers of its products in violation of the Illinois Brick rule. Since, by plaintiffs' own estimate, the U.S. sales of the industrial diamond products of De Beers during the class period were almost as great of those of GE, it is clear that Dr. Keeley's computation of damages was almost double what it should have been, for this reason alone. But there were other serious faults in his computation.

2. Unreliable and Unnecessary Estimates of Sales Figures
The figures on total U.S. sales of industrial diamond products by GE and De Beers used by Dr. Keeley in his computation were not directly derived from corporate records but upon estimates made through a complicated, roundabout process disturbingly redolent of Rube Goldberg. Plaintiffs obtained no discovery from De Beers and had no direct evidence of either the unit volume or the dollar value of DeBeers' sales of industrial diamonds during the class period either in the U.S. or abroad. Moreover, although plaintiffs did obtain from GE through discovery over half a million pages of GE documents (Pls.' Mem.Supp. GE Settlement at 2), they apparently found no record therein of GE's U.S. sales of industrial diamonds. Instead, the best they could come up with was a document reporting GE's 1987 sales of industrial diamonds in the Americas North and South. They also found a document (GE R 07193, Alan R. Wentzel Aff., Ex. 14) depicting a pie chart that they interpreted as showing that 73% of the "MBS" diamonds (GE's trade name for diamonds used in metal bonded saws) sold in the Americas in 1987 were sold in the U.S. However this pie chart did not portray sales of MBS diamonds per se but of "Saw Diamond Tools" (emphasis added). Neither GE nor De Beers sells diamond tools. Either unaware of this anomaly or choosing to disregard it, Dr. Keeley seized on this 73% fraction and applied it to GE's sales in the Americas to compute GE's U.S. sales. Moreover, he used the same fraction not only for MBS diamonds but for all categories of industrial diamonds, and not only for 1987 but for the entire six-year class period.
*423 This allowed him to make what it would be charitable to call a rough estimate of GE's U.S. sales of all categories of industrial diamonds for each year of the class period. But he wanted a figure for the U.S. sales of GE and De Beers combined and he had no data on sales by De Beers. Plaintiffs had obtained a GE estimate of De Beers' share of the worldwide market in industrial diamonds in 1990-1991. Dr. Keeley made the improbable assumption that GE and De Beers had the same relative shares of the U.S. market that they had in the worldwide market, despite the fact that GE's headquarters and focus of operations are in the U.S. while De Beers has no offices or employees here but an extensive presence elsewhere in the world. Dr. Keeley made the further improbable assumption that the two companies had these same relative shares not only in 1990-1991 but throughout the entire 1988-1993 class period, despite the fact that there were significant changes in the types of industrial diamonds they marketed during that period. Then Dr. Keeley added his estimate of U.S. sales by De Beers to his estimate of U.S. sales by GE to determine their total U.S. sales for each year, which he multiplied by his figure for the average percentage of price inflation that year to arrive at his determination of the damages sustained by plaintiffs.
This convoluted and artificial process of determining the U.S. sales of industrial diamonds by defendants, involving improbable assumptions based on other improbable assumptions, was utterly unnecessary because, mirabile dictu, hard data on such sales were available merely for the asking.

a. From GE Itself
It is astonishing that, in all of plaintiffs' extensive discovery, they never got around to asking GE about the dollar volume of its U.S. sales of each category of industrial diamonds each year during the class period. GE is a corporation whose securities are publicly traded and it therefore must publish its financial statements. If GE nevertheless takes the position that the volume of its U.S. sales of industrial diamonds is a business secret, the disclosure of such data to plaintiffs would have been protected under the secrecy order already in effect and it could have been filed under seal.

b. From Purchasers
If, for some unforeseen reason, plaintiffs could not get the sales information they wanted from GE, they had another source. They already had a list of all the U.S. purchasers of GE industrial diamond products and had communicated with them on two occasions  first, to inform them that they were putative members of the plaintiff class certified by the Court and of their right to opt out of the class and, again, to notify them of the settlement with GE and of the upcoming fairness hearing. There was no reason plaintiffs could not have contacted them again to inquire about their purchases of industrial diamonds from GE during the class period. Indeed, if and when the time comes to distribute to the class members the net proceeds of any recovery against De Beers, each of the them will have to file a claim with proof of its volume of such purchases. There is no reason to believe that they would not eagerly supply that same information for use at an inquest.
With such ready availability of accurate data as to GE's U.S. sales of industrial diamonds during the class period, we can divine no reason why plaintiffs resorted to the circuitous and speculative methodology employed by Dr. Keeley other than a desire to magnify their damages. That, of course, is what plaintiffs' counsel naturally try to do, but it is the duty of the court, even where a defaulting defendant has not appeared at the inquest to challenge the plaintiffs' computation of damages, to protect the interest of the absent defendant and insure that justice is done to all parties, even foreign corporations who are reputedly members of powerful cartels.

*424 CONCLUSION
Because of the serious errors in the opinion of Dr. Keeley, which was the only evidence submitted by plaintiffs to establish the amount of the damages to be assessed against De Beers, the Court is unable to make any finding respecting such damages at this time. Plaintiffs are directed to appear before the Court at 11:00 a.m. on Friday, December 1, 2000 and show cause why the Court should conduct a second inquest to determine the amount of such damages. This showing must include a summary of the proof which plaintiffs would offer at such an inquest. Any written submissions which plaintiffs choose to make to the Court in advance of the hearing should be delivered to the Court no later than noon on Wednesday, November 29, 2000.
So Ordered.