See also: 996 F.Supp. 18.

## In re POLYPROPYLENE CARPET ANTITRUST LITIGATION.

### MDL No. 1075.

United States District Court,
N.D. Georgia,
Rome Division.

June 2, 1997.

604

Martin D. Chitwood, Craig G. Harley, John Hinton, Appel Chitwood & Harley; W. Pitts Carr, Carr, Tabb & Pope, Atlanta, GA; Leonard Barrack and Anthony J. Bolognese, Barrack, Rodos & Bacine, Philadelphia, PA; Richard A. Lockridge, W. Joseph Bruckner, T. Brent Jordan, Lockridge Grindal Nauen & Holstein, Minneapolis, MN, for Plaintiffs.

David R. Aufdenspring, Dean S. Daskal, John M. Gross, Glenn Johnson, Powell Goldstein Frazier & Murphy; Gregory J. Digel, Holland & Knight, Atlanta, GA; Michael Dockterman, Wildman Harrold Allen & Dixon, Chicago, IL; Randall Lee Allen, Teresa Thebaut Bonder, Alston & Bird; Charles Conrow Murphy, Vaughan & Murphy, Atlanta, GA, for Defendants.

## ORDER

HAROLD L. MURPHY, District Judge.

This is an antitrust case in which Plaintiffs claim Defendants conspired to maintain artificially .the price of polypropylene carpet. The case is before the Court on Plaintiffs' Consolidated Motion to Certify Class Action [18], Plaintiffs' Motion for Leave to File Supplemental Brief [53], and Plaintiffs' Motion for Leave to Submit Supplemental Authority [59].[1]

---

1. The Court grants Plaintiffs' Motion for Leave to File Supplemental Brief, although the Court believes the issues and arguments raised in the Supplemental Brief already have been addressed sufficiently in Plaintiffs' 65–page Reply Brief.

The Court alerts all parties that future briefing schedules will be significantly more abbreviated than the period employed for class certification.

The Court also grants Plaintiffs' Motion for Leave to Submit Supplemental Authority. The

## I. Background

This action consists of nearly 20 private antitrust lawsuits consolidated and transferred to this Court on October 4, 1995, by the Judicial Panel on Multidistrict Litigation. Each lawsuit seeks damages and equitable relief pursuant to 15 U.S.C.A. §§ 15 and 26 (1997) (the Clayton Act), to remedy anticompetitive conduct prohibited by 15 U.S.C.A. § 1 (1997) (the Sherman Act). (Second Amended and Consolidated Class Action Complaint ¶ 1.)

Plaintiffs include 20 distributors of polypropylene carpet, while Defendants include seven manufacturers of polypropylene carpet. Plaintiffs contend that, beginning in June 1991, Defendants conspired and engaged in a concert of action to fix, stabilize, and maintain the prices of polypropylene carpet. (*Id.* ¶¶ 42–51.) Specifically, Plaintiffs allege Defendants and their co-conspirators agreed to eliminate discounts and otherwise charge supracompetitive prices on polypropylene carpet sold in the United States. (*Id.* ¶¶ 44, 46.) Plaintiffs further contend that Defendants fraudulently concealed this misconduct from Plaintiffs, thus tolling the applicable statute of limitations for this action. (*Id.* ¶¶ 52–55.) As a result of Defendants' alleged misconduct, Plaintiffs seek treble damages and equitable relief.[2] (*Id.* at 15–16.)

On February 22, 1996, the Court entered Pre-trial Order Number 3, which directed Plaintiffs to file a consolidated motion for class certification by March 1, 1996. On March 1, 1996, Plaintiffs filed the instant Consolidated Motion for Class Certification, and, pursuant to Pre-trial Order Number 5, the parties subsequently conducted limited discovery related to class certification. Plaintiffs seek to certify a class consisting of:

Plaintiffs and all purchasers of polypropylene carpet in the United States (excluding federal, state, and local governmental entities and political subdivisions, and excluding Defendants, their co-conspirators, and their respective parents, subsidiaries, and affiliates) that purchased polypropylene carpet directly from Defendants, or any parents, subsidiaries, or affiliates thereof, or from one or more co-conspirators, at any time from June 1991 to the present.

(Second Amended and Consolidated Complaint ¶¶ 3–21.)

In June 1996, Defendants filed their response briefs to Plaintiffs' Consolidated Motion for Class Certification. On September 3, 1996, Plaintiffs filed a 65–page reply brief in support of class certification. On November 1, 1996, Defendants filed several supplemental response briefs, as well as several notices of objection to the affidavit of Plaintiffs' expert, Dr. Martin Asher. On November 19, 1996, Plaintiffs filed a Motion for Leave to File a Supplemental Brief—attaching the Supplemental Brief—and Defendants filed several briefs in opposition. On January 7, 1997, Plaintiffs filed a Motion for Leave to Submit Supplemental Authority, to which the parties have filed response and reply briefs.

On March 7, 1997, Defendant Diamond Rug & Carpet Mills, Inc., filed a Notice of Bankruptcy and Suggestion of Automatic Stay. On April 11, 1997, the Court entered an Order acknowledging the Bankruptcy Court's stay with respect to Defendant Diamond Rug, and requested the remaining parties to submit briefs addressing the impact of Diamond Rug's Chapter 11 Petition upon the instant proceedings. The parties submitted these briefs on May 1, 1997.[3]

All pending Motions now are ripe for disposal by the Court. Because Defendant Beaulieu has challenged Plaintiffs' standing to serve as the named representatives for the proposed class, the Court will examine the

---

Court finds Plaintiffs' (and Defendants') technique of supporting legal propositions with case law altogether refreshing, and will welcome with open arms further such efforts in this case.

**2.** Also pending is a counterclaim filed by Defendant Shaw Industries, Inc. against Plaintiff The Carpet Fair, Inc.

**3.** The Court is most appreciative of the fine research and analysis supplied by the parties in these briefs. The Court cannot enter an Order on the issue, because such an Order would constitute an advisory opinion on a matter not presently before the Court. The Court has carefully reviewed the briefs, however, and intends to proceed with an expeditious resolution of this case.

standing issue before analyzing the class certification requirements set forth in Federal Rule of Civil Procedure 23.

## II. Standing of the Named Plaintiffs

■ As a prerequisite to class action litigation, individual standing requirements must:

> be met by anyone attempting to represent his own interest or those of a class. If the named plaintiff seeking to represent a class fails to establish the requisite case or controversy, he may not seek relief on his behalf or on that of the class.

*Church v. City of Huntsville,* 30 F.3d 1332, 1339 (11th Cir.1994) (internal citations omitted).

■ The amount of proof required to establish standing varies depending on the stage of the litigation at which the standing issue arises. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). At the motion to dismiss stage, the party seeking standing may rely on the facts alleged in the complaint, whereas at the summary judgment stage, the party must adduce evidence sufficient to create a question of fact on the standing issue. *Id.* The class certification stage is a hybrid of these two stages, in that the court looks beyond the pleadings but does not inquire into the merits of the case.[4] *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). The Court therefore will examine the evidence necessary to resolve the standing issue, viewing the evidence in a light most favorable to Plaintiffs.

■ Analysis of antitrust standing "involves a two-pronged inquiry into whether the plaintiff has suffered an antitrust injury and whether the plaintiff is an efficient enforcer of the antitrust laws." *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1571 (11th Cir.1991). The required "antitrust injury" is established when the plaintiff "plead[s] and prove[s] that the injury [it has] suffered derives from some anticompetitive conduct and is the type of injury the antitrust laws were intended to prevent." *Id.* (citation omitted). A plaintiff is an "efficient enforcer of the antitrust laws" if the alleged injury is neither speculative nor indirect. *Id.*

Plaintiffs contend they suffered antitrust injury as the result of a horizontal price-fixing conspiracy maintained by Defendants and other co-conspirators. Defendant Beaulieu counters that Plaintiffs lack standing because no evidence shows Plaintiffs purchased carpet during the alleged conspiracy.[5]

■ The Court agrees that, in order for Plaintiffs to possess standing to act as class representatives, Plaintiffs must adduce evidence showing they purchased carpet from the named Defendants or their co-conspirators during the alleged conspiracy period. Plaintiffs may submit this evidence in the form of affidavits, with attached receipts, as this method will expedite the resolution of this issue.

■ As for whether Plaintiffs are efficient enforcers of the antitrust laws, the Court notes Plaintiffs have alleged that they paid artificially inflated prices for polypropylene carpet. Assuming Plaintiffs absorbed the cost increase, or suffered a decreased volume of carpet resales as a result of the supracompetitive prices, Plaintiffs have suffered the classic antitrust injury, which is neither speculative nor indirect.

The Court orders Plaintiffs to tender the evidence described above within 15 days so that the Court can confirm whether Plaintiffs possess standing to proceed as the named representatives of the proposed class.

## III. Standard for Class Certification Under Rule 23

■ A request to proceed as a class action is governed by Federal Rule of Civil Proce-

---

**4.** The standard of decision for class certification proceedings is discussed in greater detail in Part III *infra.*

**5.** Defendant Beaulieu also argues that the conspiracy at issue in this consolidated action is limited to the contours of a criminal antitrust indictment to which Defendant Sunrise pleaded guilty in June 1995. For the reasons set forth in Part IV.B.2.c.(1) *infra,* this argument is without merit.

dure 23. Plaintiffs have the burden of establishing that they have satisfied each of Rule 23's certification requirements. *See In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 683 (N.D.Ga.1991).

When assessing a motion for class certification, the Court does not inquire whether Plaintiffs have adduced sufficient evidence to prevail on the merits of their antitrust claims. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 456 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1082, 137 L.Ed.2d 217 (1997). Nonetheless, the Court performs a "rigorous analysis" of the arguments offered in support of certifying the class. *Gilchrist v. Bolger,* 733 F.2d 1551, 1556 (11th Cir.1984). When performing this analysis, the Court is not limited solely to the substance of the parties' pleadings; indeed, the Court should allow—and has allowed in this case—the parties to conduct limited discovery and adduce evidence relevant to the class certification issue. *See Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1570–71 (11th Cir.1992). As pointed out by the Supreme Court, the need for such discovery varies depending on the circumstances presented by each case:

> The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action. [cits.] Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and *sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.*

General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Hudson,* 90 F.3d at 457.

Courts have employed varying standards when assessing class certification motions in complex antitrust cases. Understandably, Plaintiffs request the Court to follow the holdings of *In re Carbon Dioxide Antitrust Litig.,* 149 F.R.D. 229 (M.D.Fla. 1993), and *In re Infant Formula Antitrust Litig.,* No. MDL–878, 1992 WL 503465 (N.D.Fla. Jan. 13, 1992) (unpublished), in which the courts accepted the substantive allegations of the pleadings as true when deciding whether to certify a class of antitrust plaintiffs. *Infant Formula,* 1992 WL 503465, at *3; *Carbon Dioxide,* 149 F.R.D. at 232. Plaintiffs also point out that other courts have adopted an identical standard in antitrust cases with facts similar to those presented here. *See, e.g., In re Potash Antitrust Litig.,* 159 F.R.D. 682, 688 (D.Minn. 1995) (substance of plaintiffs' allegations taken as true in Rule 23 analysis); *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 501 (S.D.N.Y.1996) (same). Defendants counter that Eleventh Circuit authority forbids courts from following this rule in complex antitrust cases, and instead requires courts to examine the facts underlying the class certification motion. Thus, the Court encounters the first of many conflicting interpretations of the law governing class certification brought to light by the zealous advocacy of the parties.

At the outset, the Court observes that, to the extent possible, this Order and future rulings will rely on legal rules set forth by Eleventh Circuit authority. The Eleventh Circuit has considered factual circumstances nearly identical to those presented here and has issued clear instructions on how to resolve them.[6] *See Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309 (5th Cir.1978).[7]

---

6. The Court does not mean to suggest that it suffers from an unhealthy suspicion of authority from other circuits; rather, the Court simply recognizes that an abundance of soundly reasoned and directly relevant authority already exists in this circuit. This authority, in the Court's view, largely curtails the need to search elsewhere for guidance. The Court greatly appreciates the parties' exhaustive research of national case law involving antitrust class actions, and

will rely on cases from other circuits where appropriate.

7. Opinions of the Fifth Circuit issued prior to October 1, 1981, the date marking the creation of the Eleventh Circuit, are binding precedent on this Court. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209–11 (11th Cir.1981) (en banc).

The Court acknowledges that, as a 1978 case, *Blue Bird* is rather time-worn as case law goes. All antiques, however, are not necessarily obsolete. In this instance, the Eleventh Circuit continues to rely on *Blue Bird* as good law, *see Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1024, 1025 (11th Cir. 1996), and this Court must do the same. *See also Telecomm Technical Serv., Inc. v. Siemens Rolm Communications, Inc.*, 172 F.R.D. 532, 543 (N.D.Ga.1997) (relying on *Blue Bird* as binding authority).

The *Blue Bird* court carefully examined the evidence adduced in support of a class certification motion, found it to be insufficient to certify a nationwide class, and then remanded the case to the district court for further discovery. 573 F.2d at 323. Following this example, the district courts in *Domestic Air* and *Telecomm Technical* scrutinized evidence introduced in support of class certification motions. *Domestic Air*, 137 F.R.D. at 691–93; *Telecomm Technical*, 172 F.R.D. at 543.

Given this authority, the Court respectfully opts not to follow the holdings of *Carbon Dioxide* and *Infant Formula*. Both cases rely solely on a Second Circuit opinion issued the same year as *Blue Bird* while ignoring the plain language of *Falcon*, *Blue Bird*, and *Domestic Air*. To the extent *Potash* and *NASDAQ* support the standard adopted in *Carbon Dioxide* and *Infant Formula*, the Court holds that those cases are inconsistent with Eleventh Circuit case law.

The Court therefore will "scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *Domestic Air*, 137 F.R.D. at 684; *Telecomm Technical*, 172 F.R.D. at 542–43 ("[Rule 23] analysis often mandates that the Court look to the law and facts which comprise the plaintiffs' class action claims"). "This means ensuring through information submitted outside of the pleadings that the requirements of Rule 23 are met, not whether plaintiffs' claims are viable." *Telecomm Technical*, 172 F.R.D. at 543. In other words, the Court will examine whether sufficient evidence exists to reasonably conclude that Plaintiffs may proceed in the manner proposed, not whether the evidence can withstand any and all factual challenges leveled by Defendants.

In sum, the Court rejects Plaintiffs' argument that only the substantive allegations contained in the pleadings may be considered when analyzing Plaintiffs' Motion for Class Certification, and instead will scrutinize the evidence adduced by the parties under the standard enunciated above.

## IV. Class Action Certification Under Rule 23

Before certifying a class, the Court first determines whether Plaintiffs have satisfied the requirements of Rule 23(a), and then proceeds to verify that the proposed class falls within one of the categories described in Rule 23(b). *Blue Bird*, 573 F.2d at 315; *Domestic Air*, 137 F.R.D. at 697. Rule 23(a) requires Plaintiffs to show:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Plaintiffs contend they have satisfied these requirements, and further allege that the resulting class fits within Rule 23(b)(3), which requires: (1) questions of law or fact common to members of the class to predominate over questions affecting only individual members, and (2) a class action to be superior to other available methods for the fair and efficient adjudication of the controversy. Fed.R.Civ.P. 23(b)(3).

The Court first considers Plaintiffs' showing under Rule 23(a), and afterward addresses the requirements contained in Rule 23(b)(3).

### A. Rule 23(a) Analysis

The majority of Defendants' efforts in opposing class certification is reserved for the Court's Rule 23(b)(3) analysis, which the Court believes is a wise decision. Defen-

dants also have raised various objections regarding Plaintiffs' Rule 23(a) showing, however, so the Court will briefly address these issues.

### 1. Numerosity

■ The numerosity requirement is satisfied if the proposed class is so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). The requirement that joinder is impracticable does not mandate that joinder is impossible; rather, Plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class." *Domestic Air*, 137 F.R.D. at 698. Plaintiffs "generally must proffer some evidence or a reasonable estimate of the number of members comprising the purported class." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 529 (M.D.Fla.1996).

■ Plaintiffs seek to create a class consisting of themselves and all entities (excluding federal, state, and local governmental entities and political subdivisions, and excluding Defendants, their co-conspirators, and their respective parents, subsidiaries, and affiliates) that purchased polypropylene carpet directly from Defendants, or from any parents, subsidiaries, or affiliates thereof, or from one or more co-conspirators, at any time from June 1991 to the present. (Second Amended and Consolidated Complaint ¶¶ 3–21.) Given Plaintiffs' representation that such parties number in the thousands, (Plaintiffs' Brief in Support of Class Certification at 7–8), the Court believes the class is sufficiently numerous to satisfy Rule 23(a)(1).

■ A second element of the numerosity requirement is that the proposed class meet a minimal standard of identifiability. Although "[i]t is not necessary that the members of the class be so clearly identified that any member can be presently ascertained, ... [Plaintiffs] must establish that there exists a legally definable 'class' that can be ascertained through reasonable effort." *Earnest v. General Motors Corp.*, 923 F.Supp. 1469, 1473 & n. 4 (N.D.Ala.1996) (quotations and citations omitted). The class simply must meet a "minimum standard of definiteness which will allow the trial court to

determine membership in the proposed class." *Id.*; *see also Telecomm Technical*, 172 F.R.D. at 543–44 (all members of class need not be specifically identified and may be dispersed geographically).

■ Plaintiffs represent that the class members can be identified from Defendants' sales records. (Plaintiffs' Consolidated Brief in Support of Class Certification at 7.) Defendant Shaw counters that, because the conspiracy alleged by Plaintiffs includes unnamed co-conspirator manufacturers, members of the class who purchased carpet from these unnamed manufacturers cannot be identified in Defendants' sales records. (Defendant Shaw's Supplemental Brief in Opposition to Class Certification at 25–26.) Shaw also argues that Plaintiffs have failed to define adequately the term "polypropylene carpet," resulting in an ambiguity that is fatal to the proposed class. (*Id.*) The Court agrees with Shaw's arguments, and orders Plaintiffs to file within 15 days a memorandum, limited to 10 pages in length, addressing: (1) whether Plaintiffs will be able to identify proposed class members who purchased carpet from yet-to-be-named co-conspirator defendants; and (2) the definition of "polypropylene carpet," as that term is used in Plaintiffs' pleadings. Once these issues are addressed, the Court immediately will revisit whether Plaintiffs have proposed a "legally definable 'class' that can be ascertained through reasonable effort." *Earnest*, 923 F.Supp. at 1473.

### 2. Commonality

■ To satisfy the commonality requirement, Plaintiffs must show the presence of questions of law or fact common to the entire class. Fed.R.Civ.P. 23(a)(2). "[W]hile it is not necessary that every question of law or fact is common to every class member, commonality will not exist as long as there is a predominance of individual issues." *Domestic Air*, 137 F.R.D. at 699 (citing 3 Herbert B. Newburg, Newburg on Class Actions § 18.09, at 464 (2d ed.1985)). Typically, questions concerning the existence and scope of an alleged conspiracy will satisfy the commonality requirement. *Id.*; *see also Blue*

*Bird,* 573 F.2d at 319 n. 22 ("It is also clear that, while questions not common to all may arise, there are common questions of law or fact. . . . The most obvious of these questions is the very existence of a conspiracy among the Defendants."). Accordingly, the Court believes Plaintiffs have satisfied the minimal showing required to establish commonality of the legal and factual questions raised in this action.[8]

### 3. Typicality

The typicality requirement is satisfied if the claims and defenses of the representative parties are typical of the claims and defenses of the class. Fed.R.Civ.P. 23(a)(3). A representative plaintiff's claim is typical if "it arises from the same event or practice or course of conduct that gives rise to the claims of the other class members, and her or his claims are based on the same legal theory." *Domestic Air,* 137 F.R.D. at 698 (quoting 3 Newburg, *supra,* § 18.08 at 462). In other words, the Court simply inquires whether the named representatives' claims "have the same essential characteristics as the claims of the class at large." *Appleyard v. Wallace,* 754 F.2d 955 (11th Cir.1985) (quoting 7A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1764 (1st ed.1972)). The requirement may be satisfied "even though varying fact patterns support the claims or defenses of individual class members, or there is a disparity in the damages claimed by the representative parties and the other members of the class." *Domestic Air,* 137 F.R.D. at 698 (quoting 7A Charles Allen Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure: Civil § 1764 (2d ed.1986)).

▮ The Court believes Plaintiffs' claims arise from the same events and legal theories that give rise to the claims of the class members: whether Defendants conspired to fix prices in violation of the Sherman Act and whether, after Defendants fixed the prices, Plaintiffs and the proposed class members purchased carpet at prices artificially inflated from normally competitive levels. Although, when compared to the named Plaintiffs' purchases, the unnamed class members may have purchased different polypropylene carpet products at different prices and under different conditions, the nature of all the proposed class members' claims remains the same. *Domestic Air,* 137 F.R.D. at 699.

Finally, the Court finds unpersuasive Defendant Mohawk's argument that the named Plaintiffs are subject to a distinct defense compared to the remaining class members. Mohawk's argument is unpersuasive because it relies upon an assumption that the conspiracy alleged by Plaintiffs is limited to the contours of a related criminal antitrust conspiracy to which Defendant Sunrise pleaded guilty in June 1995. For the reasons set forth in Part IV.B.2.c.(1) of this Order *infra,* this argument has no merit.

In sum, the Court concludes that Plaintiffs' claims satisfy the typicality requirement of Rule 23(a)(3).

### 4. Adequacy

▮ To satisfy the adequacy requirement, Plaintiffs must show they, as class representatives, will fairly and adequately protect the interests of the class. Fed. R.Civ.P. 23(a)(4). This requirement involves a two-part inquiry: (1) whether Plaintiffs possess interests that are antagonistic to the interests of other class members, and (2) whether the proposed class' counsel possesses the qualifications and experience to conduct the litigation. *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 726 (11th Cir.1987); *Telecomm Technical,* 172 F.R.D. at 543–44.

---

**8.** The Court recognizes that Rule 23(a)(2)'s commonality requirement overlaps in significant degree with the predominance requirement contained in Rule 23(b)(3). Several courts therefore consider together the predominance requirement and the commonality requirement. *See Domestic Air,* 137 F.R.D. at 684 n. 8 ("[b]ecause of the overlap between the commonality requirement ... and the predominance requirement ..., courts often deal with the two issues simultaneously") (citing 3 Newburg, *supra,* § 18.27 at 497). The Court believes this practice has merit but is unnecessary in this case, where the evidence clearly establishes the existence of common questions of law and fact to satisfy Rule 23(a)(2).

### a. Whether Plaintiffs Have Interests Antagonistic to the Interests of Other Class Members

Defendant Beaulieu proffers two arguments with respect to this issue: (1) because Plaintiffs compete with each other and the remaining members of the class in the resale market for polypropylene carpet, an inherent conflict of interest arises among Plaintiffs and the class members; and (2) because each Plaintiff maintained business relationships with the named Defendants that varied widely in volume and degree, Plaintiffs and the class members have diverging interests regarding their individual antitrust claims.

The Court finds both arguments unpersuasive. First, an inherent conflict of interest is not created simply because a class is comprised of commercial competitors; in fact, this argument is rejected "when, on analysis, the plaintiff's claims are in common with its competitors in the class suit." 1 Herbert B. Newburg & A. Conte, Newburg on Class Actions § 3.34, at 3–169–70 (3d ed.1992). Second, parties with varying sales volumes and products may seek common antitrust relief without creating interests that are necessarily antagonistic. *See Domestic Air,* 137 F.R.D. at 699 (finding adequacy requirement satisfied despite fact that members of class purchased varying products at fluctuating prices in different markets).

Here, Plaintiffs and the remaining members of the proposed class state common claims and seek identical relief. The Court therefore concludes that the parties have compatible interests to the extent required by Rule 23(a)(4). Indeed, as Plaintiffs argue, a contrary conclusion would defeat class certification in all but consumer class actions, thereby insulating companies that fixed prices on products sold to distributors, wholesalers, and retailers from class action enforcement of antitrust laws. (*See* Plaintiffs' Reply Brief at 55.)

### b. Whether the Proposed Class' Counsel Possesses the Qualifications and Experience to Conduct the Litigation

Defendants do not seriously dispute the qualifications and experience of Plaintiffs' class counsel. The Court is familiar with these attorneys and knows well their abilities to handle the proposed action. Moreover, the Court has reviewed their resumes to substantiate this conclusion. (Plaintiffs' Brief in Support of Certification Apps. A–D.) The Court therefore concludes that Plaintiffs' attorneys possess the necessary qualifications and experience to serve as class counsel.

## B. Rule 23(b) Analysis

In addition to satisfying all the criteria in Rule 23(a), Plaintiffs also must satisfy the requirements set forth in Rule 23(b)(3).

In order to make the findings required for this analysis, the Court first must identify the substantive law that will control the outcome of the litigation. *Blue Bird,* 573 F.2d at 316; *Domestic Air,* 137 F.R.D. at 684. The Court then proceeds to answer the two questions raised by Rule 23(b)(3): (1) whether issues of law or fact common to members of the class predominate over questions affecting only individual members, and (2) whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R.Civ.P. 23(b)(3).

### 1. Substantive Law Governing This Action: The Clayton and Sherman Acts

Plaintiffs seek relief pursuant to §§ 4 and 16 of the Clayton Act, codified at 15 U.S.C.A. §§ 15 and 26, to remedy anticompetitive behavior prohibited by the Sherman Act, codified at 15 U.S.C.A. § 1. To obtain relief under these statutes, Plaintiffs must prove: (1) a violation of the antitrust laws; (2) cognizable injury attributable to the violation; and (3) at least an approximate amount of damages. *McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1557–58 (11th Cir .1992), *modified on other grounds,* 986 F.2d 444 (1993).

### 2. Whether Issues of Law or Fact Common to the Members of the Class Predominate Over Questions Affecting Individual Members

Plaintiffs propose two alternative theories to establish the predominance of common

issues: (1) because Plaintiffs allege a national horizontal price-fixing conspiracy, common issues predominate as a matter of law, and (2) even if common issues do not predominate as a matter of law, Plaintiffs have adduced sufficient evidence to satisfy the predominance requirement in this case. Defendants counter that: (1) Eleventh Circuit authority prohibits ruling as a matter of law that common issues predominate when the relevant industry features nonuniform products, markets, and distribution methods,[9] and (2) Plaintiffs have failed to adduce sufficient evidence to satisfy the predominance requirement in this case.

### a. Whether Eleventh Circuit Authority Allows Ruling as a Matter of Law That Common Issues Predominate, When the Relevant Industry Features Nonuniform Products, Markets, and Distribution Methods

 The parties vigorously debate a modern trend in case law addressing the predominance requirement in national price-fixing conspiracies. A number of recent cases have held as a matter of law that claims involving national price-fixing conspiracies automatically satisfy the predominance requirement—or at least create a presumption in favor thereof—regardless of the nature of the industry underlying the antitrust claim. *See, e.g., Potash,* 159 F.R.D. at 695 ("because the gravamen of a price-fixing claim is that the price in a given market is artificially high, there is a presumption that an illegal price-fixing scheme impacts on all purchasers of a price-fixed product in a conspiratorially affected market"); *T.R. Coleman v. Cannon Oil Co.,* 141 F.R.D. 516, 525 (M.D.Ala.1992) (allegation of conspiracy alone suffices to establish predominance, and defendants' argument based on nonuniform nature of underlying industry is a "red herring").

The Court's reliance on such a rule is obviated by the fact that the former Fifth Circuit, whose opinions are binding on this Court, expressly rejected the rule. *Blue Bird,* 573 F.2d at 316. In *Blue Bird,* the circuit court adopted a more case-specific analytical framework: in order for a national price-fixing conspiracy involving a nonuniform industry to satisfy the predominance requirement, the party seeking class certification must show that the evidence to be used at trial will be common to the class as a whole and not simply pertain to the individual plaintiffs. 573 F.2d at 323. Indeed, *Blue Bird* observed that "there are no hard and fast rules which have developed regarding the suitability of a particular type of antitrust case for class action treatment. The unique facts of each case will generally be the determining factor governing certification." 573 F.2d at 316; *see also Telecomm Technical,* 172 F.R.D. at 543 (quoting this passage).

Of course, the *Blue Bird* decision is 20 years old and did not have the benefit of the reasoning contained in the more recent cases. The Court therefore must decide whether the Eleventh Circuit would abandon the case-specific analytical framework set forth in *Blue Bird* in favor of the modern case law.

For four reasons, the Court concludes that *Blue Bird* remains good law in the Eleventh Circuit. First, *Blue Bird* continues to be cited as binding authority by both district and appellate courts in this circuit. *E.g., Andrews,* 95 F.3d at 1025; *Telecomm Technical,* 172 F.R.D. at 543; *Contact Lens,* 170 F.R.D. at 531; *Domestic Air,* 137 F.R.D. at 684.

Second, the Court believes cases adopting a rule that national price-fixing conspiracies automatically satisfy the predominance requirement either ignore or misapply the principles of *Blue Bird.* The most revealing examples of this phenomenon lie in the district court cases of this circuit. For instance, *Carbon Dioxide* observed that "courts have consistently found that '[w]here a horizontal price-fixing conspiracy is alleged, the questions common to the class predominate over questions that may affect only individual

---

9. Several Defendants argue that an industry with nonuniform products, markets, and distribution methods necessarily prevents a finding that common issues predominate with respect to antitrust impact and damages. (*E.g.,* Defendant Beaulieu's Brief in Response to Plaintiffs' Reply Brief at 10; Defendant Shaw's Brief in Opposition to Class Certification at 13; Defendants Mohawk and Aladdin's Memorandum in opposition to Class Certification at 14.)

class members.'" 149 F.R.D. at 234 (quoting *Infant Formula,* 1992 WL 503465, at *12). Neither *Carbon Dioxide* nor *Infant Formula* cite or discuss *Blue Bird,* and instead rely primarily on a 1977 district court case from the Northern District of Illinois. *See Infant Formula,* 1992 WL 503465, at *6 (citing *In re Folding Carton Antitrust Litig.,* 75 F.R.D. 727 (N.D.Ill.1977)). Thus, both cases ignore binding authority when resolving the predominance issue.

The Court believes *Coleman* erroneously applied *Blue Bird* when it interpreted the case to stand for the following proposition: an allegation of a price-fixing conspiracy "satisfies the Rule 23(b) predominance inquiry." *Id.* at 525. This Court is hard pressed to reconcile this interpretation with the actual language of *Blue Bird,* given *Blue Bird*'s admonition that courts must perform an individualized analysis of the claims—as well as the industry underlying the claims—before class certification in an antitrust case may be granted. 573 F.2d at 328. *Coleman* thus overlooks *Blue Bird*'s express caution that some antitrust conspiracy claims may not be appropriate for class action litigation:

> If ... particularized proof is necessary [to prove impact in an antitrust conspiracy], then it would seem to us that each individual plaintiff's claim would receive more thorough consideration in individually litigated actions.

*Id.* at 327.

The Court believes *Domestic Air* correctly applied the analytical framework set forth in *Blue Bird.* 137 F.R.D. at 685–692. Relying on *Blue Bird,* the *Domestic Air* court required the plaintiffs seeking class certification to show that their evidence at trial would be common to the class as a whole rather than pertaining to individual plaintiffs. *Id.* at 684. The plaintiffs presented "a considerable amount of evidence" concerning a nationwide conspiracy to fix prices. *Id.* at 688. The plaintiffs also adduced expert testimony proposing economic formulas that would employ common proof to prove antitrust impact and damages. *Id.* at 689–91. In this way,

the plaintiffs fulfilled their obligation under *Blue Bird* to show "that questions concerning the existence of the conspiracy, the impact of the conspiracy, and the formulaic measure of damages predominate over any issues that are not common to the class." *Id.* at 693.

Third, the antitrust principles underpinning the court's reasoning in *Blue Bird* have experienced no significant changes in the 20 years after the case's publication. The primary principle underlying *Blue Bird* is the "great importance [this circuit places] on the 'impact' element of an antitrust cause of action." 573 F.2d at 327. Indeed, this emphasis on the impact requirement spurred the *Blue Bird* court to reject the general rule that national price-fixing conspiracies automatically satisfy the predominance requirement. *Id.* Today, the Eleventh Circuit continues to place a heavy reliance on the impact element. *See Cable Holdings of Georgia, Inc. v. Home Video, Inc.,* 825 F.2d 1559, 1561–62 (11th Cir.1987). For this reason, the Court finds no basis to believe the Eleventh Circuit would modify its holding in *Blue Bird.*

Fourth, after reviewing cases in other circuits that have adopted a general rule of finding predominance in antitrust conspiracy actions, the Court is not convinced that these cases create a better analytical framework than *Blue Bird.* In these circumstances, a general rule paints with too broad a brush and overlooks cases in which class certification may be improper. For example, the parties seeking class certification may rely upon an expert whose proposed methodology to establish antitrust impact and damages using common proof is inherently faulty. Or, it is possible that the industry underlying the antitrust claim is simply too diversified for one class to represent adequately all the parties harmed by the defendants' anticompetitive activities. In either case, proceeding as a class action without examining these issues would create hardships for the court at trial and would result in injustice to parties with valid claims and defenses.[10]

10. Conversely, a rule that absolutely forecloses a finding that common issues predominate in cases involving diverse markets and products would allow companies to evade enforcement of the antitrust laws simply by creating complex pricing structures and distribution channels.

For these reasons, the Court will follow the analytical framework set forth in *Blue Bird* when deciding whether to certify the class proposed by Plaintiffs. The Court now provides a brief summary of this analytical framework, and afterward considers the facts of this case under this framework.

b. **Analytical Framework for Applying the Predominance Inquiry to Industries Featuring Nonuniform Products, Markets, and Distribution Methods**

Stated broadly, Plaintiffs' burden is to establish that common or "generalized proof" will predominate at trial with respect to the essential elements of their antitrust claim. *Blue Bird,* 573 F.2d at 317; *Domestic Air,* 137 F.R.D. at 685. When performing this analysis, *Blue Bird* and *Domestic Air* both confronted industries that were nonuniform in terms of their products, markets, and distribution methods. These circumstances did not automatically preclude a finding that common issues and generalized proof would predominate at trial. *Blue Bird,* 573 F.2d at 323 (rejecting the defendants' argument that, because of varying purchasers, products, and marketing arrangements, a common scheme to fix prices cannot be demonstrated as to all defendants). However, the *Blue Bird* and *Domestic Air* courts required the plaintiffs to show that their evidence at trial would establish one common conspiracy, one common impact among all the plaintiffs, and common damages. *Id.* The *Blue Bird* court adopted a test for plaintiffs seeking to proceed in this manner, inquiring whether:

> the addition or subtraction of any of the plaintiffs to or from the class will have a substantial effect on the substance or quality of the evidence offered. If such addition or subtraction of plaintiffs does affect the substance or quality of evidence offered, then the necessary common question might not be present.

*Id.* at 322.

The *Blue Bird* and *Domestic Air* courts applied this test to each of the three elements required to establish liability under the Clayton Act. First, with respect to the existence of a conspiracy, the courts required the plaintiffs to show they would prove one common conspiracy to fix prices in the industry. *Blue Bird,* 573 F.2d at 322–23; *Domestic Air,* 137 F.R.D. at 688–89. The *Blue Bird* plaintiffs failed in this regard because they planned to present evidence on a state-by-state basis, effectively showing 50 different price-fixing conspiracies. 573 F.2d at 322–23. The *Domestic Air* plaintiffs succeeded by showing their evidence involved only one nationwide conspiracy that encompassed all relevant products, markets, and distribution methods. 137 F.R.D. at 688–89.

Second, with respect to proof of antitrust impact, the courts required the plaintiffs to show they would prove "impact as to each member of the plaintiffs' class without having to resort to lengthy individualized examinations." *Blue Bird,* 573 F.2d at 328; *Domestic Air,* 137 F.R.D. at 689. This requirement is admittedly difficult, because under Eleventh Circuit law, "impact is a question unique to each particular plaintiff and ... must be proven with a fair degree of certainty." *Domestic Air,* 137 F.R.D. at 689; *see also Contact Lens,* 170 F.R.D. at 531 ("the impact element of an antitrust cause of action is the key to class determination"). Moreover, the common evidence must allow "each plaintiff ... [to] prove that this conspiracy was actually implemented in his [relevant market] and that it did in fact cause him injury." *Blue Bird,* 573 F.2d at 327.

Defendants argue that, under *Blue Bird,* " 'generalized proof' of the fact of injury is impossible where the products, prices, and markets are diverse." (Defendants Mohawk and Aladdin's Memorandum in Opposition to Class Certification at 14; Defendant Shaw's Brief in Opposition to Class Certification at 13; Defendant Beaulieu's Brief in Response to Plaintiff's Reply Brief at 10.) *Blue Bird* adopted no such holding. In fact, *Blue Bird* expressly recognized the possibility that plaintiffs may satisfy the impact requirement in such circumstances. 573 F.2d at 328. This recognition is qualified in light of the difficulties that may arise:

> [G]iven the diverse nature of the ... market, we have difficulty envisioning how the plaintiffs can prove in a manageable manner that the conspiracy was indeed imple-

mented in a particular geographical area, and that it did in fact cause damage. More specifically, we do not understand how the plaintiffs can make this proof without examining the relevant . . . market where each individual plaintiff is located. 573 F.2d at 328. Nevertheless, the plaintiffs in *Domestic Air* solved this problem by using economic formulas that compared the defendants' illegally inflated prices with the prices of a competitive market. 137 F.R.D. at 689–90. Relying on these formulas, the *Domestic Air* court concluded that the plaintiffs could use common evidence to prove class-wide impact at trial.[11] *Id.*

In light of the arguments offered by both Plaintiffs and Defendants with respect to the issue of antitrust impact, the Court believes it is important to emphasize a key principle underlying *Blue Bird* and *Domestic Air*. At the class certification stage, the Court examines evidence as to *how* the class proponents intend to prevail at trial, not whether the *facts* adduced by the class proponents are susceptible to challenges by class opponents. *Blue Bird*, 573 F.2d at 321; *Contact Lens*, 170 F.R.D. at 531 (the court examines "what *type* of proof" is available to support the class proponents' claims) (emphasis added). The difference can be summarized as follows: at the class certification stage, Plaintiffs must show that antitrust impact *can be proven* with common evidence on a classwide basis; Plaintiffs need not show antitrust impact *in fact occurred* on a classwide basis.

Third, with respect to the damages requirement, the *Domestic Air* court required the plaintiffs to show they could compute damages through the use of common proof.[12] 137 F.R.D. at 692. This requirement is far less demanding than the impact requirement, the court observed, because antitrust plaintiffs need only introduce evidence sufficient for a jury to estimate the amount of dam-

ages. *Id.* Relying on formulas devised by the plaintiffs' expert, the court concluded that the evidence would permit calculation of a minimum overcharge applicable to all members of the class that resulted from the antitrust conspiracy. *Id.*

Given this summary of case law, the Court concludes Plaintiffs must satisfy the following criteria when making their showing on the predominance requirement:

(1) Plaintiffs must show they will prove one common conspiracy to fix prices in all relevant markets of the polypropylene carpet industry. In other words, Plaintiffs must plan to use common evidence that reveals a "common nucleus of operative facts" concerning one national conspiracy;

(2) Plaintiffs must show they will prove, with a fair degree of certainty, impact as to each member of the proposed class without resorting to lengthy individualized examinations. The common evidence must allow each class member to prove that this conspiracy was actually implemented in the member's relevant market and that the conspiracy did in fact cause injury; and

(3) Plaintiffs must show they will compute damages through the use of common proof. In this respect, Plaintiffs need only introduce evidence sufficient for a jury to estimate the amount of damages.

### C. Assessment of Plaintiffs' Evidence Under the *Blue Bird* Analytical Framework

### (1) One Common Conspiracy to Fix Prices in All Relevant Markets of the Polypropylene Carpet Industry

As stated above, the Court cannot presume that, because Plaintiffs have alleged a national price-fixing conspiracy, proof of the existence of this conspiracy common to all Plaintiffs will predominate at trial. Rather, Plaintiffs must show they will use com-

---

11. "We are not attempting . . . to hold as a matter of law that the impact requirement in the case before us defeats any possibility of a class certification. It may be that the . . . plaintiffs can figure out some way to show impact without having to resort to lengthy individualized examinations." *Id.* at 328.

12. Consistent with the status of antitrust law in 1978, *Blue Bird* does not consider the computation of damages as a separate element of proof required to obtain damages under the Clayton Act. The Court believes that this difference does not alter in any way the analysis set forth in this section.

mon evidence that reveals a common nucleus of operative facts concerning one national conspiracy.

Plaintiffs allege that, from June 1991 to present, Defendants and other carpet manufacturers conspired to fix and maintain prices for all polypropylene carpet products. (Second Amended and Consolidated Class Action Complaint ¶ 42.) Plaintiff thus allege a single conspiracy, in which Defendants' executives communicated with one another regarding prices for polypropylene carpet and subsequently implemented illegal pricing structures. (*Id.* ¶¶ 48–50.) To prove these claims at trial, Plaintiffs contend that all class members will seek to establish that: (1) the conspiracy included all Defendants and other manufacturers; (2) the conspiracy was *common* knowledge at the highest levels of Defendants' corporate offices; (3) the conspiracy extended to all polypropylene carpet products manufactured by Defendants; and (4) the conspiracy lasted throughout the period of time alleged in the Complaint.

Generally, common proof of the existence of a price-fixing conspiracy will predominate at trial if the plaintiffs plan to rely upon evidence of the defendants' conduct, rather than the conduct of individual class members. *Domestic Air,* 137 F.R.D. at 688–89; *see also Contact Lens,* 170 F.R.D. at 531 (proof of consciously parallel business conduct by defendants is circumstantial evidence from which a conspiracy, tacit or express, can be inferred). In this situation, the addition or subtraction of any plaintiffs to or from the class will have no effect on the substance and quality of the evidence offered. *Blue Bird,* 573 F.2d at 322. Of course, the general rule fails if the evidence of Defendants' conduct can be grouped into categories in which certain conduct affects only certain class members.

Plaintiffs have pointed to a considerable amount of evidence concerning an alleged price-fixing conspiracy that is national in scope and involved all polypropylene carpet products manufactured by Defendants. (*See* Plaintiffs' Reply Brief at 11–22.) This evidence is filed under seal, thus precluding the Court from discussing it in detail. Nonetheless, the evidence primarily involves commu-nications among Defendants' executives concerning the prices for polypropylene carpet products. (*Id.*) This evidence is supplemented by circumstantial evidence of geographical proximity and frequent social contacts among these individuals. (*Id.*) At this stage, the Court believes the evidence does not lend itself to division into categories of conduct that affect only certain class members.

This evidence does not conclusively prove the existence of a national price-fixing conspiracy. However, at this stage of the proceedings, the Court does not inquire *whether* Plaintiffs can prove the existence of a conspiracy, but *how* Plaintiffs will prove the existence of a conspiracy at trial. The Court therefore finds inappropriate Defendants' arguments that the record in its present form fails to establish that Defendants engaged in a five-year conspiracy involving all polypropylene carpet products. Particularly irrelevant to the class certification issue is Defendants' fact-based argument that, because Defendant Sunrise's chief executive officer said he was unaware of a price-fixing conspiracy beyond the contours of his June 1995 criminal plea agreement, Plaintiffs cannot prove the existence of such a conspiracy.

In addition, the Court is compelled to address specifically one argument proffered by Defendants. This argument proceeds as follows:

> Plaintiffs' claims rely *in part* on a criminal indictment returned against Defendant Sunrise, which resulted in Sunrise admitting in June 1995 to a price-fixing conspiracy that involved only 20–ounce polypropylene carpet, included only one other Defendant, and lasted only several months. As a result, Plaintiffs' present action *must be* pigeonholed within the narrow factual contours of the criminal indictment, and can extend no further.

This argument, in the Court's opinion, barely passes the "straight face" test. Plaintiffs' Complaint contains allegations that expressly extend beyond the facts of the Sunrise criminal indictment, and Plaintiffs have pointed to evidence—filed under seal—that supports allegations that the conspiracy ex-

tended beyond the contours of the 1995 criminal indictment. (*See* Second Amended and Consolidated Class Action Complaint ¶¶ 42–51; Plaintiffs' Reply Brief at 11–22.) Moreover, the Court is aware of no authority that requires a civil antitrust plaintiff to plead only the facts of a prior criminal indictment. To the contrary, several cases flatly reject this theory. *See, e.g., In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 615–16 (D.Kan.1995); *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727 (N.D.Ill.1977). The Court agrees with the reasoning of these cases and finds Defendants' argument to have no merit.

In sum, Plaintiffs have shown to the Court's satisfaction that the existence of a single price-fixing conspiracy will be proven predominantly by evidence that is common to all class members. *See Domestic Air*, 137 F.R.D. at 689.

### (2) Impact as to Each Member of the Proposed Class

Stated broadly, antitrust impact is established in this type of case by showing that Defendants' activities had the effect of stabilizing prices above competitive levels. *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.*, No. 91–cv–76072–DT, 1993 WL 527928, at *3 (E.D.Mich. Oct. 19, 1993) (unpublished). As stated above, the Court cannot presume that, simply because Plaintiffs have alleged a national price-fixing conspiracy, Plaintiffs' proof of antitrust impact will be common to all Plaintiffs and will predominate at trial. Rather, Plaintiffs must show they plan to use common evidence that reveals impact as to each member of the proposed class without resorting to lengthy individualized examinations. Moreover, the common evidence must allow each class member to prove the conspiracy actually was implemented in the class member's relevant market and did in fact cause injury to the class member.

Of particular significance to this inquiry is the nature of the industry underlying the price-fixing claim. If the industry features homogenous products and markets, a finding that common proof of antitrust impact predominates over individual proof usually is appropriate because the conspiracy claim readily lends itself to common proof of impact. *Blue Bird*, 573 F.2d at 328 n. 35. Conversely, an industry featuring nonuniform products and markets poses a difficult hurdle because the antitrust impact will have occurred under varied circumstances. *Id.* at 328. A finding that common proof predominates in such cases is by no means an impossibility, however, as the plaintiffs simply must show that, at trial: they will use common proof with respect to all the various markets, products, and customers.[13] *Id.*

Plaintiffs attempt to satisfy the predominance requirement in two ways. First, Plaintiffs contend that the products and markets involved in the polypropylene carpet industry are essentially fungible and homogeneous. Second, Plaintiffs contend that their expert, Dr. Martin Asher, has devised formulas that will allow Plaintiffs to use common evidence to prove antitrust impact.

With respect to Plaintiffs' first argument, the Court disagrees that the polypropylene carpet industry's products and markets are fungible and homogeneous. Rather, the industry features more than 500 different products, many of which are custom-made for specific customers. (*See* Defendant Shaw's Brief in Opposition to Class Certification at 14 and evidence, filed under seal, cited therein.) In addition, the industry maintains varying distribution channels as well as different pricing schemes tailored to these channels. (*See* Asher Dep. at 306–09.)

With respect to Plaintiffs' second argument, the Court must assess the testimony of Plaintiffs' expert, Dr. Asher,[14] to determine

---

**13.** As such, the Court respectfully disagrees with *Coleman's* position that evidence regarding the complexity of the industry underlying the alleged antitrust conspiracy is a "red herring." 141 F.R.D. at 526. Under *Blue Bird*, such evidence is highly relevant to the inquiry of whether common proof of impact will predominate at trial. *Blue Bird*, 573 F.2d at 327–28; *see also Domestic*

*Air*, 137 F.R.D. at 686 n. 10 (under *Blue Bird*, a court must "examine and understand the relevant industry").

**14.** Defendants Mohawk and Aladdin have filed a Notice of Objection to Dr. Asher's affidavit, and other Defendants have raised various objections

whether it is possible to show impact to all class members through common proof. Once again, the zealous advocacy of the parties has revealed a wide disparity in the courts' assessment of expert testimony in these circumstances. The Court therefore will set forth the standard with which Dr. Asher's testimony will be reviewed by the Court.

### (a) Standard for Assessing the Testimony of Plaintiffs' Expert Witness in a Class Certification Context

■ Antitrust plaintiffs seeking class certification often rely on the testimony of experts such as Dr. Asher, who devise formulas with which the class purports to show individualized impact through common proof. At the class certification stage, this expert testimony need not conclusively establish antitrust impact; the testimony simply must be "of sufficient substance that it could be submitted to the jury for its consideration," or, in other words, " 'logically probative of a loss attributable' to the alleged conspiracy." *Domestic Air*, 137 F.R.D. at 692 (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977)).

■ When examining the formulas and analytical frameworks offered by experts to show antitrust impact, courts have employed a variety of standards. In *Domestic Air*, the court allowed the party opposing certification to show through empirical evidence that the expert's proposed methodology was fundamentally flawed and therefore useless, but noted otherwise that the "weight to be given to [the expert's] testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date." *Id.* at 690–92. Other courts have refused to consider any evidence discrediting the expert's methodology. *See Contact Lens*, 170 F.R.D. at 531 ("That Defendants' expert disagrees with the methodologies and conclusions propounded by [plaintiffs' expert] is no reason to deny class certification. Whether or not plaintiffs will be successful in persuading the jury that

there has been a common impact remains to be seen."); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 384 (S.D.N.Y. 1996) (although defendants' expert "quarrels with the methodology underlying the analysis performed by plaintiffs' expert and questions the accuracy of his work[,] ... [w]e need not consider this testimony in detail, as it is for the jury to evaluate this conflicting evidence and to determine what weight to give to the experts' conclusions"). Still other courts have delved deeply into the facts to be "plugged into" the expert's proposed formulas, performing a function that is, in this Court's opinion, best reserved for a factfinding stage of the proceedings. *See In re Agricultural Chemicals Antitrust Litig.*, No. 94–40216–MMP, 1995 WL 787538, at *6 (N.D.Fla.1995) (finding, after a review of the facts underlying the expert's conclusions, that the expert "had no basis on which to conclude—one way or the other—whether the suggested price or reported price was an overcharge, and therefore had no basis on which to conclude that there had been 'impact' ").[15]

The Court believes the proper standard for assessing expert testimony in these circumstances must be compatible with the general standard of review for class certification motions: that is, the standard should assess the *type* of evidence that the class proposes to use at trial, while avoiding an assessment of the *merits* of this evidence. (*See* Part III of this Order *supra.*) The Court therefore concludes that it is proper to assess the validity of the proposed methodology to show impact, but arguments relying on the veracity or authenticity of facts to be "plugged into" the formulas are inappropriate.

### (b) Analysis of Dr. Asher's Proposed Procedure to Show Individual Impact Through Common Proof

Dr. Asher suggests the following procedure will allow Plaintiffs to prove individualized antitrust impact through common proof:

in their briefs. The Court has reviewed these objections and finds them to be without merit.

**15.** *See also Dry Cleaning,* 1993 WL 527928, at *4 ("The preliminary inquiry is not whether each of the methods is valid, but only to assess whether

the methods are able to prove damages on a class basis."). The Court is unsure how it could assess whether a proposed formula "is able to prove damages on a class basis" without analyzing the validity of the formula's methodology.

During the conspiracy period, the factors that influenced the price structure of polypropylene carpet were common across all manufacturers, and were common with respect to all the relevant products and markets. (Asher Aff. ¶¶ 11–14.) Moreover, when making and implementing pricing decisions, the manufacturers treated all polypropylene carpet products as one identifiable market segment. (*Id.* ¶ 14.) Consequently, the prices of different polypropylene carpet products generally moved together, regardless of individualized discounting to specific customers. (*Id.* ¶ 16.) Under these circumstances, artificially inflated prices charged for these products would have impacted all purchasers of the products, i.e., all members of the proposed class.

Dr. Asher thus opines that "for the purposes of assessing class wide impact of the alleged conspiracy, the polypropylene carpet industry is an identifiable market segment, which can and should be examined on a nationwide basis." (*Id.* ¶ 5.)

Several courts have considered analytical frameworks similar to the one proposed by Dr. Asher and have agreed that the frameworks allow individualized impact to be established through common proof. In *Domestic Air*, the plaintiffs' expert found a structure to defendants' pricing schemes and definite relationships among the prices. 137 F.R.D. at 691. The expert testified that, at trial, he could show that revenues from conspiratorially affected sales were significantly higher than revenues from sales that were not affected by the conspiracy. *Id.* at 690. Given the relationships among the industry's prices, the expert concluded that the difference in revenues would show that a price-fixing conspiracy impacted all purchases of products encompassed within the conspiracy. *Id.*

In *Industrial Diamonds*, the defendants argued that common proof of impact was impossible because the defendants marketed thousands of different products at individually negotiated prices. 167 F.R.D. at 383. The plaintiffs countered by pointing to price lists that allegedly showed that the prices of all the various products moved together regardless of individualized discounts. *Id.* Because the plaintiffs relied on the price lists, the court differentiated between class members who purchased products using price lists and those who purchased customized products not included in the price lists. *Id.* The court believed that, if the plaintiffs proved the alleged conspiracy resulted in artificially inflated list prices, a jury could conclude that each purchaser of a list-price product suffered some impact, regardless of the discount negotiated by each class member. *Id.* This conclusion was supported by the testimony of an expert who opined that the individual discounts were based, at least in part, on the applicable list price. *Id.* With respect to customized products, however, the court worried that each transaction would have to be scrutinized to ascertain whether the purchaser paid a supracompetitive price. *Id.* at 384. Reasoning that individualized questions of impact would predominate in such circumstances, the court refused to certify a class with respect to the non-list-price products. *Id.; compare Dry Cleaning*, 1993 WL 527928, at *5–6 (finding predominance requirement not satisfied where plaintiffs failed to show existence of any structure to industry's prices).

The Court cannot simply extrapolate the outcomes in *Domestic Air, Industrial Diamonds,* or *Dry Cleaning* to the facts presented here. These cases can, however, provide guidance to the Court in performing its analysis.

After considering the evidence and arguments proffered by the parties thus far, the Court believes a hearing is necessary to resolve the issue of whether common evidence of antitrust impact will predominate at trial. Plaintiffs and Defendants have vigorously advocated diametrically opposed legal positions with respect to many of the key issues presented here, and much of the evidence offered by the parties reflects these positions. In light of the Court's analysis of the law governing this case, both Plaintiffs and Defendants likely will wish to reevaluate the evidence and arguments offered to address the issue of whether Plaintiffs can show impact by using evidence common to all class members.

To narrow the issues addressed at the hearing, the Court observes that several of Defendants' arguments are either inappropriately raised at this stage of the proceedings or are unpersuasive:

(1) *Dr. Asher assumed the existence of the conspiracy as alleged by Plaintiffs, and his testimony is therefore useless.* The assumption that a conspiracy exists does not indicate that the methodology to prove impact in such circumstances is flawed. *See Domestic Air,* 137 F.R.D. at 690 (expert assumed existence of conspiracy as alleged by plaintiffs). The Court believes this argument is directed more to factual issues Plaintiffs will attempt to establish after the discovery process, rather than to the methodology proposed by Dr. Asher. Defendants will have ample opportunity to discredit the facts underlying Dr. Asher's analysis at the fact-finding stage of the litigation.

(2) *The deposition testimony of Johnny West, Defendant Sunrise's chief executive officer, suggests that the conspiracy alleged by Plaintiffs only reaches the contours of Sunrise's June 1995 criminal plea agreement. Thus. Dr. Asher's analysis, which is designed to address a much broader conspiracy, is of no use to the Court.* As discussed in Part IV.B.2.c.(1) *supra,* Plaintiffs are not limited to, and have not limited their claims to, the contours of the June 1995 criminal indictment. Moreover, Plaintiffs have adduced sufficient evidence at this stage of the proceedings to rebut this argument.

(3) *Plaintiffs' Complaint alleges only a conspiracy to "halt" the discounting of carpet prices, and therefore Dr. Asher has analyzed a conspiracy that is not alleged by Plaintiffs.* Plaintiffs' Complaint extends to *any* effort to fix, stabilize, or maintain prices of polypropylene carpet, (Second Amended and Consolidated Class Action Complaint ¶¶ 42–51), and Defendants' attempts to arbitrarily redefine the anticompetitive behavior alleged by Plaintiffs is unsupported by any authority or the record in this case.

(4) *Dr. Asher's affidavit fails to show that Defendants' products are homogenous and fungible.* As stated in Part IV.B.2.b. *supra,* Plaintiffs need not make such a showing, but rather must demonstrate how such circumstances do not prevent the use of common evidence to show impact.

(5) *The evidence suggests that, with respect to one specific polypropylene carpet product, list prices did not move together.* In its present form, this is a factual argument best reserved for trial.

(6) *Dr. Asher's analysis "did not establish whether actual transaction prices are related to list prices."* Dr. Asher need not conclusively establish this relationship until the fact-finding stage. At present, the Court simply examines whether Plaintiffs have adduced sufficient evidence to show that, at trial, Dr. Asher's proposed analytical framework *could* establish such a relationship.

The Court believes the following issues must be resolved at the hearing:

(1) Plaintiffs must adduce at least some evidence to support Dr. Asher's assumption that the list prices for polypropylene carpet are related to the actual transaction prices. Plaintiffs need not establish this relationship as a matter of fact, but simply must adduce sufficient evidence to allow the Court to conclude that Plaintiffs intend to rely on the relationship at trial. The Court is especially mindful of the fact that Plaintiffs have not been allowed discovery of the actual transaction prices. The Court believes Plaintiffs need not conduct discovery of the transaction prices as recorded by Defendants to make the required showing. If some degree of discovery is required, however, the Court will consider ordering an expedited discovery schedule with respect to this issue.

(2) If Plaintiffs plan to rely solely on the price list to show common impact to all class members, Plaintiffs should explain how Dr. Asher's analytical framework will account for custom-made products that were not included in price lists.

(3) Plaintiffs must show how Dr. Asher's proposed analytical framework will account for industry-specific factors. Defendants have proposed a number of factors that the Court agrees may be relevant, including

the diversity of products, customers, pricing practices, payment terms, and business cycles.

The Court wishes to impress upon the parties that this list is not intended to be exhaustive. The parties should address any issues they believe are relevant to the impact analysis. However, the Court advises Plaintiffs and Defendants to review carefully their arguments and evidence to comport with the Court's conclusions of law governing class certification, as irrelevant and improper arguments and evidence during the hearing will not be welcomed.

### (3) Damages Through Common Proof

Dr. Asher suggests that two formulas will allow Plaintiffs to prove a reasonable amount of damages through common proof:

(1) The class will compare the prices charged for polypropylene carpet products during the alleged conspiracy period with prices charged for the same products before the alleged conspiracy began. These prices will be subjected to regression analyses, which will allow the class to control for certain identifiable variables affecting the prices. With this information, the class will compute the amount the Defendants overcharged for the products sold during the conspiracy period.

(2) The class will compare the relevant characteristics of the polypropylene carpet products with those of a comparable "yardstick" industry. In the same way as the first formula described above, this data will be subjected to regression analyses to control for certain identifiable variables affecting the prices, and the class will compute overcharges for the products sold during the conspiracy period.

(Asher Aff. ¶ 19.) Dr. Asher suggests that both formulas will be unaffected by the fact that class members paid variable prices for different carpet products, because price differences "are typically handled within the pricing structure, leaving the common element of the conspiratorial increase in the grid to be determined and then translated into awards to injured plaintiffs." (Id. ¶ 20.) In sum, Dr. Asher concludes that, "while the precise type of approach to measure damages cannot be finalized at this stage of the proceedings, generally accepted methods can be used with a reasonable degree of certainty to measure the amount of damages suffered by the class and class members." (Id. ¶ 22.)

Once again, Dr. Asher's proposed formulas bear a striking similarity to formulas used in other antitrust class actions. In Domestic Air, the plaintiff class proposed to compare the revenues of conspiratorially affected sales to the revenues of non-conspiratorially affected sales, as well as to the revenues of a similar "yardstick" industry. 137 F.R.D. at 690. According to the Domestic Air plaintiffs' expert, the formulas "would permit the calculation of a minimum overcharge applicable to all members of the class." Id. at 692. The court agreed, noting that "it is not necessary that plaintiffs show that [the expert's] methods will work with certainty at this time. Rather, plaintiffs' burden is to present the Court with a likely method for determining class damages." Id. at 693.

In Dry Cleaning, the class proponents offered a three-step formula to calculate damages. 1993 WL 527928, at *5. First, the amount of overcharges incurred as a result of the conspiratorially inflated prices would be calculated as a percentage value of the actual transaction prices. Next, the percentage value would be multiplied by each class member's sales volume to arrive at the damage figure sustained by that class member. Finally, the individual damages would be aggregated to reveal the total amount of damages. The court found this proposed methodology to be insufficient to satisfy the predominance requirement, because the plaintiffs' expert made no showing of how the calculations would be adapted to the circumstances of that particular case.

The Court cannot simply extrapolate the outcomes in Domestic Air and Dry Cleaning to the facts presented here. These cases can, however, provide guidance to the Court in performing its analysis.

After considering the evidence and arguments proffered by the parties thus far, the Court believes a hearing is necessary to resolve the issue of whether common evidence of damages will predominate at trial. The

parties in this case largely have merged the damages issue with their analysis of antitrust impact. In addition to separating their arguments with respect to damages, the Court believes the parties may wish to reevaluate their arguments and evidence to comport with the Court's analysis of the law governing this case. The Court cannot identify at this time the specific issues that must be addressed, because Plaintiffs and Defendants have not expressly addressed the damages issue in their briefs.

### 3. Whether a Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

■■■ Defendants do not vigorously dispute the superiority of the class action procedure for resolving the antitrust claims presented by these 20 individual cases, and the Court believes this to be a wise decision. Under Rule 23(b)(3), criteria relevant to the superiority determination include:

(1) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(4) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). The Court will address each criterion in turn.

First, the Court believes the class members do not possess a significant interest in individually litigating antitrust claims against Defendants. Second, the Court is not aware of a significant amount of litigation already pending that has been commenced by or against the class members. Third, the Judicial Panel on Multidistrict Litigation already has decided that it is desirable to concentrate the litigation of these claims in one forum. Fourth, as demonstrated by the instant Motions, this action is likely to generate difficulties whether it proceeds as a class action or as hundreds of individual trials. Nonethe-

less, the Court believes the class proposed by Plaintiffs, with the modifications ordered above, will be manageable to the extent class certification may be warranted. Indeed, the hardships presented by a contrary result are monumental:

Separate proceedings would produce duplicate efforts, unnecessarily increase the costs of litigation, impose an unwarranted burden on this Court and other courts throughout the country, and create the risk of inconsistent results for similarly situated parties. Additionally, the cost associated with individual claims may require claimants with potentially small claim amounts to abandon otherwise valid claims simply because pursuing those claims would not be economical.

*Potash*, 159 F.R.D. at 699; *see also Domestic Air*, 137 F.R.D. at 693–94 (same).

The Court thus concludes that the class action procedure is superior to other available methods for the fair and efficient adjudication of the controversy.

## V. Format for the Evidentiary Hearing

At the evidentiary hearing, the Court intends to rely on the procedural format suggested by the Manual for Complex Litigation 3d (1995). As set forth in the Manual:

When an evidentiary hearing on class certification is necessary, it should not be a minitrial to adjudicate the merits of the class or individual claims. The court may, however, need a detailed explanation from the parties regarding these claims and *how they will be presented* and defended at trial on the merits—not to assess the merits of the claims, but to *project the type of trial that likely will take place* if the case proceeds as a class action.

Manual for Complex Litigation, Third § 30.13, at 217 (emphasis added). The Court believes this format is consistent with the principles of law governing this case as summarized in this Order.

Therefore, the hearing will proceed in the following manner. First, each side will be limited to three witnesses, although the Court anticipates that only each side's expert

witness will be necessary. Ten days prior to the date of the hearing, the parties will submit, to the Court and to the opposing parties, the direct testimony of the witnesses in written form with a limit of 30 pages. *See id.* § 22.51, at 160–61.

At the hearing, each side will be permitted 30 minutes for an opening statement; the parties must decide whether they wish to divide the time among themselves or allow one party to make the argument. Next, each witness will be sworn and will adopt the written statements as his or her testimony. After each witness adopts the written testimony, each side then will be allowed 15 minutes, if needed, to supplement the written statement with direct examination. Cross-examination will be limited to two hours, to be divided among the various parties as they wish. The Court will allow one hour for redirect examination, to be divided among the parties as they wish. No further examinations of the witnesses will be permitted, unless the Court wishes to ask questions of the witness. Finally, each side will be allowed 30 minutes for closing argument, to be divided among the parties as they wish.

Following the hearing, the parties must submit within 15 days proposed findings of fact and counterfindings responding to the opposing side's submissions. *See* Manual for Complex Litigation, Third § 22.52. Proposed findings should be drafted in neutral language, avoiding argument and conclusions, and must identify the evidence that allegedly supports each finding. Furthermore, the findings should be drafted in such a manner that allows the Court to understand, to the greatest degree possible, the economic principles relied upon by the parties.

Once these findings are filed, the Court will place the resolution of this matter as its top priority. The parties are expected to be prepared to begin discovery and other appropriate matters once the final Order is entered by the Court.

## VI. Conclusion

ACCORDINGLY, the Court **DENIES** Plaintiffs' Motion for Leave to File Supplemental Brief [53], **GRANTS** Plaintiffs' Motion for Leave to Submit Supplemental Authority [59], and **DEFERS** ruling on Plaintiffs' Consolidated Motion for Class Certification until an evidentiary hearing is conducted as described above. Furthermore, the Court **ORDERS** Plaintiffs to file with the Court within 15 days: (1) the affidavits described in Part II of this Order *supra,* and (2) a memorandum providing further detail about the proposed class as described in Part IV.A.1. of this Order *supra.*

Finally, the Court **ORDERS** the parties to appear for an evidentiary hearing as described in Parts IV.B.2.c.(2) & (3) and V of this Order, *supra.* The Court believes that 30 days will allow sufficient time for the parties to prepare for the hearing, and therefore the Court intends to conduct the hearing during the week of July 7, 1997. Counsel for the parties should contact the Court's Deputy Clerk as soon as possible to arrange a date for the hearing.